926 A.2d 320

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF–RESPONDENT, v.
G.L., DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP OF M.J.C., A MINOR.

Argued May 2, 2007—Decided July 9, 2007.

*Beatrix W. Shear,* Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Shear* and *Mark E. Tabakman,* Designated Counsel, on the letter briefs).

*Andrea M. Silkowitz*, Assistant Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (*Stuart Rabner*, Attorney General of New Jersey, attorney; *Ms. Silkowitz* and *Monique D'Errico*, Deputy Attorney General, on the letter briefs).

*Cynthia A. McCulloch*, Designated Counsel, argued the cause for respondent M.J.C. (*Yvonne Smith Segars*, Public Defender, attorney).

*Diana Dunker* argued the cause for amicus curiae, Legal Services of New Jersey (*Melville D. Miller, Jr.*, President, attorney; *Ms. Dunker, Mr. Miller, Mary M. McManus–Smith* and *John A. Salois*, on the brief).

PER CURIAM.

On this appeal we revisit the issue that we recently addressed in *New Jersey Division of Youth and Family Services v. M.M.*, 189 *N.J.* 261, 914 *A.*2d 1265 (2007): When may a parent be subjected to the termination of her parental rights for failing to eliminate harm to the child posed by her spouse?

I.

The parties in this parental termination action are Gloria Lynch and her daughter Mary Jane Carleton whose father is Gloria's husband Ted Carleton.[1] Ted and Gloria were also the parents of an older son, Isaac, whose death focused the court's attention on the family. Gloria, who lives with a son from a previous relationship, is an accountant with a full-time job at a company in New York City. She also has pastoral duties at her church.

The case arose in March 2002 when Isaac, an infant, died under suspicious circumstances. At the time, Ted was home alone caring for Isaac. When the infant experienced respiratory failure, Ted claimed that he panicked and tried to call Gloria on her cell

---

[1] Pseudonyms have been used to protect the privacy of the minor children.

phone, but was not able to get through to her. He failed to call anyone else for medical assistance and waited for her to return home. When she arrived, Gloria immediately called 911. The operator contacted the paramedics and instructed Gloria to perform cardiopulmonary resuscitation (CPR) on her lifeless son. Thereafter, paramedics arrived and also attempted CPR on Isaac before taking him to Trinitas Hospital in Elizabeth. Later that same day, he was transferred to the Pediatric Intensive Care Unit at Newark Beth Israel Hospital where he was placed on ventilator support. A few days later, he died of his injuries.

After Isaac's death, the hospital explained to Ted and Gloria, as well as to the New Jersey Division of Youth and Family Services (DYFS), that the infant displayed signs of Shaken Baby Syndrome (SBS), including retinal hemorrhages and cerebral edema. The final autopsy report indicated that Isaac died from SBS. Investigators suspected Ted of having caused the infant's injuries, but he denied culpability. Subsequently, Ted was indicted for second-degree manslaughter and third-degree endangering the welfare of a child.

While the criminal proceeding against Ted was pending, Gloria became pregnant with another child. When DYFS learned of Gloria's pregnancy in early 2003, it decided to keep the case open for ongoing supervision. Mary Jane was born in May of 2003. At that time, Gloria and Ted had been living apart for several months. Although Gloria was not convinced that Ted had shaken Isaac to death, she agreed to submit to any restrictions DYFS imposed to maintain custody of Mary Jane. Those restrictions included a prohibition against Ted having unsupervised visitation with Mary Jane and Gloria's agreement to meet with a caseworker, participate in counseling, attend a parenting skills course, and undergo a psychological evaluation. The treatment summary following her counseling sessions noted that Gloria's progress was positive. That expert concluded that Gloria would not risk harming Mary Jane and recommended a psychiatric evaluation and

psychotherapy to help her deal with the loss of her son and her husband.

Gloria complied with those recommendations. She underwent a psychiatric evaluation and became involved in therapy despite a reluctance to do so because of her belief that her spiritual community provided all the support she needed. Her therapist diagnosed her with post-traumatic stress disorder and recommended continued therapy to address emotional issues that had arisen as a result of her son's death. Gloria followed those recommendations in an effort to demonstrate to DYFS her commitment to Mary Jane. Further, although Ted had been present at the birth and seen Mary Jane at the hospital, after a number of unannounced visits, it was apparent to DYFS that Gloria had ceased cohabiting with Ted and that she had never allowed Ted unsupervised visitations with Mary Jane.

However, according to DYFS, Gloria continued to express her belief that Ted did not shake Isaac, but instead was guilty of failing to call for help. On that basis, in July 2003, DYFS filed a verified complaint seeking to place Mary Jane under its care, custody, and supervision due to concern that Gloria would provide Ted access to the infant. Nothing in the complaint suggested that Gloria had ever done so. Rather, the complaint was rooted in the notion that if Gloria believed in Ted, she could not be trusted to keep Mary Jane safe. The trial judge ultimately ordered Mary Jane to be placed under the care, custody, and supervision of DYFS, and directed Gloria to submit to further psychiatric evaluations and to participate in counseling to provide a risk assessment regarding reunification.

Mary Jane was placed in the home of her godparents, and later was transferred to the home of another relative. Gloria continued throughout the proceedings to represent that she would never allow Ted unsupervised visitation with Mary Jane and that she would cooperate in every way with DYFS to achieve reunification with her daughter.

DYFS's goal throughout the process was to reunite Gloria and Mary Jane. Indeed, as late as the summer of 2004, DYFS sought reunification, provided it was permitted to stay involved with the family through family counseling, parental problem-solving skills courses, and stress management assistance. At that time, DYFS made special note of the fact that Gloria had complied with every one of its requests and recommended that family preservation services be implemented. As part of those recommendations, DYFS arranged another psychological evaluation to ascertain Gloria's parenting skills.

Over the next several months, Gloria complied with all of the requirements imposed on her for the specific purpose of reunification with her daughter. She remained candid and stoic throughout the therapy process despite her continuing belief that her religious life provided all the therapy she needed and her view that the process was overly intrusive. She expressed her demoralization over the fact that she could not live under the same roof as her husband and her daughter, but said she found the strength to cope through her faith.

The result of that evaluation, as with those previous, was that the psychologist recommended that Gloria be permitted to raise her child. Despite his unease regarding Gloria's hesitation at confiding in strangers and her unwillingness to publicly declare her husband guilty of the homicide of their infant son, the psychologist found Gloria to be an able mother and recommended that she and Mary Jane be reunited provided Gloria continued psychotherapy and the family remain under DYFS supervision for at least six months.

The trial judge disagreed. After submission of the newest psychological evaluation which supported reunification, the judge ordered DYFS to devise a new permanency plan because she found that reunification was not in the best interests of Mary Jane. The judge was concerned that Mary Jane would be at risk because Gloria refused to acknowledge that Ted shook their infant son to death. The judge was particularly bothered because Gloria

advanced her own theory of Ted's guilt—that his wrongdoing was in failing to call 911.[2] In light of her concerns, the trial judge changed the goal from reunification to adoption.

Following the trial judge's order, DYFS changed its permanency plan to adoption by Mary Jane's relatives, who took over responsibility for the child from her godparents. In late 2004, DYFS filed a complaint for guardianship and for termination of Gloria's parental rights. The judge ordered two more psychological evaluations to assess Gloria's parenting ability. The results of those evaluations were in equipoise. The first psychologist determined that more therapy was needed to determine the level of Gloria's reluctance to keep Mary Jane from her father, and whether that reluctance posed a tangible risk of harm. The second came to many of the same conclusions as the first regarding Gloria's mental situation, but advised that weekly therapy was all that was needed, and that she should be reunited with Mary Jane.

Those two psychologists also performed bonding evaluations while observing Gloria and Mary Jane. Because Mary Jane had only lived with Gloria for the first year of her life, the bond between them was a weak one. Both psychologists found that the key to developing a stronger bond between mother and daughter was more frequent and regular contact. Neither expert found that breaking the weak link was particularly detrimental to Mary Jane. A third bonding evaluation did not recommend reunification because, by then, Mary Jane was considered traumatized and

---

[2] A jury found Ted not guilty of manslaughter, but guilty of child endangerment. He was sentenced to nine years imprisonment with a three-year period of parole ineligibility. Ted appealed his conviction. In an unpublished per curiam opinion, the Appellate Division upheld the conviction, finding that he was guilty of child endangerment due to shaking Isaac, not his failure to call 911. According to the panel, the State advanced only that theory, and the prosecutor's reference to his failure to call 911 was merely an attempt to discredit Ted's version of the events and to demonstrate his attempt to conceal his culpability. Ted's projected parole date is July 11, 2007.

suffering in her cognitive development, and, thus, it was recommended that she not be disturbed from her current placement.

The trial judge terminated Gloria's parental rights in September of 2005. She found that the continued relationship between Gloria and Ted placed their daughter at risk of harm once Ted was released from prison. (Gloria had visited Ted ten times during his incarceration and had initially lied about the contact). That continued contact with her husband was deemed unacceptable by the trial judge. She reasoned that Gloria's unwillingness or inability to sever ties with Ted posed a serious risk to Mary Jane despite Gloria's absolute compliance with all of DYFS's strictures. In addition, she found that terminating Gloria's parental rights would not do more harm than good because of the thin bond between Gloria and Mary Jane.

Gloria appealed, arguing that DYFS had not proven that termination of her parental rights was in the best interests of Mary Jane and that the trial judge had failed to conduct an individualized analysis of the termination standards. Deferring to the trial judge's factual findings, the Appellate Division affirmed.

Gloria filed a petition for certification that we granted. 189 *N.J.* 105, 912 *A.*2d 1264 (2007). We also granted amicus status to Legal Services of New Jersey.

## II.

Gloria argues that DYFS failed to prove by clear and convincing evidence that termination of her parental rights was in the best interests of Mary Jane; that the trial judge misapplied the best-interests standard; that the judge erred by holding her husband's conviction against her; and that the judge should have focused on her capacity to parent Mary Jane instead of the facts surrounding Ted's conviction.

DYFS counters that there was clear and convincing evidence that Gloria harmed Mary Jane by maintaining a relationship with Ted, and, as such, her parental rights were properly terminated.

Legal Services of New Jersey argues that the courts erred in lending too much weight to the bonding between Mary Jane and her foster parents and that such bonding has become an improper justification for the termination of parental rights in many cases.

### III.

 Our review of a trial judge's decision to terminate parental rights is limited. *In re Guardianship of J.N.H.*, 172 *N.J.* 440, 472, 799 *A.*2d 518 (2002). Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record. *In re Guardianship of J.T.*, 269 *N.J.Super.* 172, 188, 634 *A.*2d 1361 (App.Div.1993). Particular deference is afforded to decisions on issues of credibility. *Cesare v. Cesare*, 154 *N.J.* 394, 411–13, 713 *A.*2d 390 (1998). There is an exception to that general rule of deference: Where the issue to be decided is an "alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," we expand the scope of our review. *In re J.T., supra,* 269 *N.J.Super.* at 188–89, 634 *A.*2d 1361. Despite such circumstances, deference will still be accorded the trial judge's findings unless it is determined that they went so wide of the mark that the judge was clearly mistaken. *Ibid.* With that standard and its exceptions in mind, we proceed with our analysis.

### IV.

 The right of parents to raise their children is a fundamental one of constitutional magnitude. *Stanley v. Illinois,* 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551 (1972); *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 346 (1999). Although "fundamentally important," those interests are "not absolute," *In re K.H.O., supra,* 161 *N.J.* at 347, 736 *A.*2d 1246, and "must be balanced against 'the State's *parens patriae* responsibility to protect the welfare of children,' " *N.J. Div. of Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 294–95, 914 *A.*2d 1265 (2007) (quoting *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992)).

"Because that power involves the State acting in the place of parents, it is limited to situations in which the [S]tate has demonstrated that the child's parent or custodian is unfit.' " *Ibid.* "[P]resumptions of parental unfitness may not be used in proceedings challenging parental rights and all doubts must be resolved against termination." *Ibid.* Specifically, "the termination of parental rights involves consideration of the nature of the right, the permanency of the threatened loss, and an evaluation of parental unfitness." *In re G.P.B., Jr., supra,* 161 *N.J.* at 404, 736 *A.2d* 1277.

In furtherance of those principles, the Legislature enacted *N.J.S.A.* 30:4C–15.1a to govern the termination of parental rights. The court must find that

> 1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> 2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> 3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> 4) Termination of parental rights will not do more harm than good.
>
> [*N.J.S.A.* 30:4C–15.1a.]

DYFS bears the burden of proving each of those prongs by clear and convincing evidence. *N.J. Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 611–12, 512 *A.2d* 438 (1986) (adopting clear and convincing standard as minimum required by Fourteenth Amendment). Furthermore, when a trial judge applies the statute, he must be cognizant that "the considerations involved are extremely fact sensitive and require particularized evidence that address the specific circumstances in the given case." *M.M., supra,* 189 *N.J.* at 280, 914 *A.2d* 1265 (internal quotations omitted). Importantly, those four prongs are not "discrete and separate," but "relate to and overlap with one another to provide a

comprehensive standard that identifies a child's best interests." *In re K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246.

## V.

We have carefully reviewed this record in light of the relevant standard and have determined that DYFS failed to meet its burden of satisfying the four statutory prongs by clear and convincing evidence. Under the first prong, DYFS must make a showing that Mary Jane's safety, health or development was endangered *by Gloria.* There simply is no proof of that. As far as this record reveals, Gloria is an accomplished person: an accountant with a responsible job, the assistant pastor of her church, and an able and loving mother who successfully raised another child. Moreover, Gloria never harmed Mary Jane. She complied with every requirement imposed on her by DYFS and satisfied both DYFS and the experts as to her ability to function as Mary Jane's mother. At no point was any proof offered that Gloria herself had endangered Mary Jane in any way.

More importantly, given what this case is really about, DYFS also failed to show by clear and convincing evidence that Gloria was unwilling or unable to eliminate the threat posed by Ted to Mary Jane. The record underscores that Gloria never allowed Ted to see his daughter without supervision and covenanted to maintain that stance. She also underwent numerous psychological and psychiatric evaluations and participated in whatever counseling DYFS requested with the result that reunification was DYFS's goal.

This case differs completely from the facts in *Division of Youth & Family Services v. M.M.* There, we found that a father who refused to eliminate the threat posed to his special-needs son by his substance-abusing wife, whose parental rights had been terminated, had forfeited his own right. There, the father insisted on continuing to live with his wife and offered no realistic parenting plan that would have kept his son away from his offending spouse. That is simply not the evidence before us. Gloria has, at all times,

shown that she is willing and able to do whatever is necessary to raise and care for her daughter. She stopped living with Ted and, at the behest of DYFS, refused to allow him to see Mary Jane unsupervised. Had the father in *M.M.* taken such steps, the outcome in that case would likely have been different.

The heart of the issue here is that Gloria refused to condemn Ted for the death of Isaac. Instead, and despite the autopsy report and the jury verdict, she insisted that his crime was in failing to call for help. Although that stance was unrealistic and a tactical error, it did not justify the loss of her parental rights.

*N.J.S.A.* 30:4C–15.1a is conduct-based. So long as Gloria was an able mother (and no proof was offered to suggest otherwise) and conducted herself in a way that secured Mary Jane's safety (and she did so at every turn), the statutory standard for terminating Gloria's parental rights was not met.

Here, the gravamen of the judge's decision was that the continuing relationship between Gloria and Ted, in itself, was a threat to Mary Jane. We disagree. That threat is based on speculation and not on clear and convincing evidence. The judge simply presumed that Gloria could not keep Mary Jane safe. As we have said, presumptions have no place in a termination analysis. *In re K.H.O., supra,* 161 *N.J.* at 347, 736 *A.*2d 1246.

Further, there is no reason why Gloria cannot maintain her belief in and relationship with Ted—the father of her children—so long as she does not live with him, allow him unsupervised visits with Mary Jane, or otherwise place Mary Jane at risk. That is the point of our decision in *M.M.,* in which we faulted the father for his failure to safeguard the child, not for his desire to continue his relationship with his wife.

One final note: the trial judge considered the lack of a strong bond between Gloria and Mary Jane as supporting termination. To be sure, the bond was thin as the direct result of the improvident removal of Mary Jane from her mother's custody in 2003. Because she has lived with others for most of her life, Mary Jane

has naturally become attached to them and her bond with her mother was weakened. That conclusion merely satisfies the fourth prong of the statute—that termination would not do more harm than good. That prong serves as a fail-safe against termination even where the remaining standards have been met. It does not provide an independent basis for termination where the other standards have not been satisfied.

Mary Jane should never have been removed from Gloria's custody. It follows that Gloria's parental rights should not have been terminated. At this point, what is required is the reunification of mother and child. That is, of course, easier said than done because of the ravages of the passage of time. Accordingly, a visitation schedule should be limned forthwith on an accelerating schedule, prepared and overseen by a psychologist with the assistance of such other counseling professionals for both Gloria and Mary Jane as necessary to help pave the way for prompt reunification.

We note that the record was supplemented and suggests that Ted has advised the Parole Board that he intends to live with Gloria when he is released from prison. Whether that is the present plan is unclear. Obviously, in the event that Gloria chooses to live with Ted, the reunification scheme to which we have adverted will not be allowed.

## VI.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial judge for proceedings consistent with this opinion.

Justice WALLACE, JR., concurring.

I concur in the result. Unlike the majority, I cannot distinguish this case from *Division of Youth & Family Services v. M.M.*, 189 *N.J.* 261, 914 *A.*2d 1265 (2007). In my view, in both this case and in *M.M.*, the Division failed to satisfy by clear and convincing

evidence the requirements of *N.J.S.A.* 30:4C–15.1a to justify termination of parental rights.

Justice RIVERA–SOTO joins in this opinion.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN and HOENS—5.

*For concurrence*—Justices WALLACE and RIVERA–SOTO—2.