RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0751-16T3
 A-0753-16T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

F.C. and W.S.,

 Defendants-Appellants.

________________________________

IN THE MATTER OF THE GUARDIANSHIP OF
F.S. and W.A.S.,

 Minors.
________________________________

 Submitted September 26, 2017 - Decided October 20, 2017

 Before Judges Leone and Mawla.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Hudson County,
 Docket No. FG-09-0121-16.

 Joseph E. Krakora, Public Defender, attorney
 for appellant F.C. (Stephania Saienni-Albert,
 Designated Counsel, on the briefs).
 Joseph E. Krakora, Public Defender, attorney
 for appellant W.S. (Stephen P. Dempsey,
 Designated Counsel, on the briefs).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Andrea M. Silkowitz,
 Assistant Attorney General, of counsel;
 Elisabeth E. Juterbock, Deputy Attorney
 General, on the brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minors (Margo E.K.
 Hirsch, Designated Counsel, on the brief).

PER CURIAM

 In these consolidated matters, defendants F.C and W.S. appeal

from a September 30, 2016 judgment terminating parental rights to

their minor children, W.A.S. (Walter) and F.S. (Fiona).1

Defendants contend plaintiff the New Jersey Division of Child

Protection and Permanency (Division) failed to prove all four

prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence.

Having considered the parties' arguments in light of the record

and applicable legal standards, we affirm.

 I.

 The following facts are taken from the record. F.C. and W.S.

are the biological mother and father of Walter and Fiona who are

presently seven and five years old. Both parents are unemployed

and receive disability benefits. F.C. has a low I.Q., and W.S.

1
 We use pseudonyms to protect the children's privacy.

 2 A-0751-16T3
is partially paralyzed as a result of a gunshot wound. Both

parents struggle with substance abuse, and neither has had stable

housing since 2012. The children have several cognitive and

physiological health conditions requiring medical attention.

Walter in particular is diagnosed with and medicated for attention

deficit hyperactivity disorder and oppositional defiant disorder.

He was classified as pre-K disabled.

 On March 20, 2012, the Division received its first referral

alleging child neglect and drug use by F.C and W.S. Though the

allegation of neglect was unfounded, F.C. and W.S. admitted to

smoking marijuana and agreed to an evaluation with a certified

alcohol and drug counselor (CADC). The evaluation results showed

F.C. tested positive for marijuana, and W.S. positive for PCP,

marijuana, and barbiturates. Based on the CADC assessment, the

Division implemented a safety protection plan and services on

April 18, 2012. The safety plan required F.C. to attend a

substance abuse treatment program, and W.S. to have only supervised

contact with the children until he completed a drug counseling

program.

 In the substance abuse treatment program, F.C. tested

positive for marijuana on numerous occasions, and as a result was

discharged from the program. After her discharge, F.C. tested

positive for marijuana on at least twelve separate occasions. W.S.

 3 A-0751-16T3
also demonstrated little progress as he tested positive for

marijuana and PCP.

 In June 2012, the Division placed home health aides from

Visiting Homemaker Services of Hudson County in F.C.'s apartment

to provide in-home support for the family. However, the reports

from the service show F.C. and W.S. failed to cooperate with the

service or respond to the children's needs, including ensuring

basic hygiene and a clean home. Homemaker Services continued to

assist the family through April 2013, nearly a year of service.

 On June 29, 2012, W.S. began an outpatient drug program at

Health Path Consulting Services. However, he was discharged less

than one month later for non-compliance and continued drug use.

 In August 2012, F.C. began inpatient treatment in the Mommy-

and-Me program at Straight and Narrow. There, she exhibited

parenting and behavioral issues during instruction on parenting

skills, group therapy, and anger management classes. F.C.

completed treatment in February 2013, and was referred to Eva's

Village and Sunrise House for transitional housing, but refused

to participate in either program. F.C. later admitted to smoking

marijuana immediately following completion of the Straight and

Narrow program.

 W.S. began a second outpatient drug treatment at C-Line

Community Outreach in September 2012. He immediately tested

 4 A-0751-16T3
positive for marijuana, PCP, and alcohol. He continued to test

positive for PCP numerous times in the ensuing five months, and

then ceased attending the program altogether.

 On March 5, 2013, the Division filed a complaint for care and

supervision of Walter and Fiona. The same day, F.C. returned to

Project Second Chance for outpatient sessions. She continued to

test positive for marijuana a week later. She was discharged

later that month for non-compliance.

 In April 2013, F.C. and the children were admitted into

Sunrise House Halfway Home, an inpatient program. There, staff

reported numerous instances of non-compliance and inappropriate

behavior by F.C.

 In May 2013, W.S. began counseling at New Pathways for drug

abuse. He tested positive for PCP twice in June 2013, and was

discharged for non-compliance.

 In July 2013, F.C. was evaluated by the Center for Evaluation

and Counseling. F.C. reported a prior diagnosis of depression for

which she had been prescribed medication. She asserted that she

no longer took the medicine due to a lack of insurance. As a

result, the Division arranged for a psychological assessment by

Dr. Christopher Friedrich in September 2013. Dr. Friedrich

concluded F.C. was a high-risk parent for child neglect. This was

 5 A-0751-16T3
exacerbated by F.C.'s unwillingness to consider psychotropic

medication to address her mental health.

 On September 8, 2013, F.C was transferred to the Mommy-and-

Me program at Eva's Village. F.C.'s progress at Eva's Village was

poor. F.C. had at least ten instances where she failed to

adequately supervise the children. F.C. bullied fellow residents,

and refused to engage in outpatient treatment or submit to urine

screens. In December 2013, the Division received a discharge

summary from Eva's Village stating F.C. would be discharged

effective January 3, 2014.

 As a result of both parents' lack of progress and resistance

to the services provided, the Division filed for custody of the

children, which the trial court granted on December 13, 2013. The

children were transferred to a resource home where they remained

until March 13, 2014, when they were transferred to the relative

resource home of a paternal cousin K.M. They lived with K.M.

through the entry of judgment.

 After the children were removed, F.C. and W.S. continued not

to comply. F.C. agreed to enroll in an intensive outpatient

program, but failed to do so, claiming she did not need treatment.

The Division scheduled three CADC assessments in April 2014 for

F.C., but she did not attend. When F.C. did attend the fourth

assessment in May 2014, she disclosed her continued marijuana use.

 6 A-0751-16T3
The Division referred F.C. to New Pathways and she successfully

engaged in treatment, but her progress was short-lived. F.C. made

little progress in anger management, and by September 2014 she

began testing positive for marijuana and missing therapy sessions.

She continued to test positive for marijuana in 2015, and was

discharged from the Integrity House rehabilitation program for

exhibiting continual anger and non-compliance.

 F.C.'s visitations with the children also demonstrated her

poor compliance and progress. After the removal, F.C. was afforded

four hours per week of supervised visitation. The Division's

records demonstrate F.C. arrived late to visitation, and her

interactions with the children were inappropriate. F.C. was

physically aggressive with the children and reacted negatively to

their attempts to gain her attention. On other occasions, F.C.

ignored the children's misbehavior choosing instead to play with

her phone.

 W.S. also demonstrated no progress after the children's

removal. In December 2013, seventeen days after the children's

removal, and again in January 2014 he tested positive for PCP.

W.S.'s PCP use continued throughout 2014 and 2015. He failed to

comply with court ordered evaluations and substance abuse

treatment, and was discharged from several programs for non-

compliance.

 7 A-0751-16T3
 In May 2015, W.S. was incarcerated for assaulting F.C. with

a knife and unlawful possession of a weapon. He was released in

August 2015, but failed to notify the Division. Although the

Division continued to offer W.S. substance abuse services, he

failed to attend any CADC evaluations from November 2015 to July

2016. The Division also offered W.S. assistance finding housing

and transportation throughout the time he remained un-

incarcerated.

 W.S. was also afforded visitation, but did not attend with

regularity. When W.S. did attend visitation he did little to aid

F.C. with the children, and displayed a lack of interest in parent-

child interaction.

 Prior to trial, F.C. underwent psychological and bonding

evaluations with the Division's expert Dr. Robert Kanen. The Law

Guardian's expert Dr. Antonio Burr also evaluated F.C., as did

F.C.'s expert Dr. Andrew Brown.

 Dr. Kanen described F.C. as "severely hostile." He concluded

F.C.'s chronic anger, irritability, cognitive defects, history of

drug and alcohol abuse, and social history resulted in a severe

parenting deficit, rendering her unable to adequately parent the

children. Dr. Kanen opined reunification would expose the children

to an unnecessary risk of harm.

 8 A-0751-16T3
 Dr. Burr's evaluation described F.C. as "indifferent or

unconcerned" with the children's developmental needs. He

concluded F.C.'s hostile and belligerent attitude prevents her

from functioning appropriately as a parent. He noted F.C.'s

pervasive irritability causes her to lack empathy and effective

parenting skills. Dr. Burr opined these deficits impeded the

children's ability to achieve permanency and outweigh any bond

they have with F.C.

 Dr. Brown observed a bond between F.C. and the children.

However he did not endorse the return of custody to F.C. because

she could not keep the children safe from harm.

 Drs. Kanen and Burr performed psychological and bonding

evaluations on W.S. Dr. Kanen observed W.S. was disinterested and

failed to engage with the children. He concluded the children do

not recognize W.S. as a reliable parent, and reunification would

likely cause the children serious and enduring harm.

 Dr. Burr observed virtually no interaction between W.S. and

the children. Dr. Burr opined W.S. was not a viable resource for

the children. He noted W.S. "is not cognizant of his children's

need for nurturing and safety."2 Dr. Burr concluded the children

2
 At trial Dr. Burr explained W.S.'s substance abuse causes him to
"[continue] to engage in behavior that is deleterious to himself
and potentially to the children."

 9 A-0751-16T3
would experience greater loss if they were separated from the

resource parent than W.S.

 Trial occurred over four days, and on September 30, 2016, the

trial judge issued an opinion concluding the Division had

established by clear and convincing evidence that termination of

parental rights was appropriate. With respect to prong one of the

best interests test codified in N.J.S.A. 30:4C-15.1(a), the trial

judge stated:

 Despite the Division's best attempts to engage
 [the parents] in treatment, they have failed
 to fully comply with a drug abstinence regimen
 and continue to lead unstable lives.
 . . . .
 Both children have exhibited unstructured
 behaviors and developmental delays resulting
 from the unstable lives of both parents. [The
 parents'] continued inattention to the needs
 of the children has and will continue to
 impair the health and development of both
 children.

 The trial judge found the Division had met prong two of the

best interests standard. The judge determined the parents'

continued drug use and failure to complete drug treatment or

transition services demonstrated an unwillingness to eliminate the

harm to the children.

 Addressing prong three, the trial judge recounted the

extensive history of services provided by the Division that we

have noted above. The trial court stated both parents were

 10 A-0751-16T3
afforded drug treatment, psychological evaluations, homemaker

services, and visitation, yet neither parent demonstrated success

by having these services. The trial court concluded: "This Court

finds that the Division provided reasonable efforts at treatment

to [the parents]. The Division offered appropriate services that

neither parent benefitted from."

 The trial judge found the Division met the fourth prong of

the best interests test. Considering the testimony of all three

experts, the trial court credited the testimony of Dr. Kanen that

the children "do not know [F.C.] as a reliable caregiver as she

is non-comforting and non-nurturing to her children." The trial

court also credited Dr. Burr's testimony that F.C.'s "drug use

impacts negatively on her overall functioning and on her

parenting."

 The trial court similarly concluded W.S. was not a viable

parent. The trial court credited Dr. Kanen's testimony that W.S.

"has severe parenting deficits, having an intellectually disabled

range of intelligence and severe impairment in reasoning and

judgment." The trial court stated Dr. Kanen "further opined that

[W.S.'s] cognitive limitations, substance abuse problems, severe

[] personality disorder, and homelessness leave him unable to

provide the care and supervision necessary to protect his children

from potentially serious harm." The trial court concluded: "These

 11 A-0751-16T3
conditions prevent him from providing his children with a

permanent, safe and secure home now or in the foreseeable future."

 The trial court found clear and convincing evidence of a bond

between the children and the resource parent. Although there was

evidence the children were familiar with F.C. and W.S., the trial

court found credible Dr. Burr's opinion that "the attachment is

questionable."

 The trial court concluded termination of parental rights

would not do more harm than good, and based on the cognitive and

developmental needs of the children, they would be safe if

separated from their parents. In this appeal, F.C. and W.C.

challenge the trial court findings.

 II.

 The scope of our review on an appeal from an order terminating

parental rights is limited. N.J. Div. of Youth & Family Servs.

v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of

J.N.H., 172 N.J. 440, 472 (2002)). We will uphold a trial judge's

fact-findings if they are "supported by adequate, substantial, and

credible evidence." N.J. Div. of Youth & Family Servs. v. R.G.,

217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Family Servs.

v. E.P., 196 N.J. 88, 104 (2008)). No deference is given to the

court's "interpretation of the law" which is reviewed de novo.

D.W. v. R.W., 212 N.J. 232, 245-46 (2012) (citing N.J. Div. of

 12 A-0751-16T3
Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010); Balsamides

v. Protameen Chems., 160 N.J. 352, 372 (1999)).

 "We accord deference to factfindings of the family court

because it has the superior ability to gauge the credibility of

the witnesses who testify before it and because it possesses

special expertise in matters related to the family." N.J. Div.

of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2014) (citing

Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial

court's conclusions are so 'clearly mistaken' or 'wide of the

mark' should an appellate court intervene and make its own findings

to ensure that there is not a denial of justice." E.P., supra,

196 N.J. at 104 (quoting G.L., supra, 191 N.J. at 605). We also

accord deference to the judge's credibility determinations "based

upon his or her opportunity to see and hear the witnesses." N.J.

Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88

(App. Div. 2006) (citing Cesare, supra, 154 N.J. at 411-13),

certif. denied, 190 N.J. 257 (2007).

 When terminating parental rights, the court focuses on the

"best interests of the child standard" and may grant a petition

when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are

established by clear and convincing evidence. As codified,

N.J.S.A. 30:4C-15.1(a) requires the Division prove:

 13 A-0751-16T3
 (1) The child's safety, health, or
 development has been or will continue to
 be endangered by the parental
 relationship;

 (2) The parent is unwilling or unable to
 eliminate the harm facing the child or
 is unable or unwilling to provide a safe
 and stable home for the child and the
 delay of permanent placement will add to
 the harm. Such harm may include evidence
 that separating the child from his
 resource family parents would cause
 serious and enduring emotional or
 psychological harm to the child;

 (3) The division has made reasonable efforts
 to provide services to help the parent
 correct the circumstances which led to
 the child's placement outside the home
 and the court has considered alternatives
 to termination of parental rights; and

 (4) Termination of parental rights will not
 do more harm than good.

 "Importantly, those four prongs are not 'discrete and

separate,' but 'relate to and overlap with one another to provide

a comprehensive standard that identifies a child's best

interests.'" G.L., supra, 191 N.J. at 606-07 (quoting In re

Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

 F.C. contends there was insufficient evidence supporting the

court's findings on each of the four prongs of the best interests

standard. W.S. attacks the sufficiency of the trial court's

findings regarding the first three prongs. After reviewing

defendants' arguments in light of the record and applicable legal

 14 A-0751-16T3
principles, we are convinced there is substantial credible

evidence supporting the trial court's findings of fact and

determination the Division established by clear and convincing

evidence under N.J.S.A. 30:4C-15.1(a), that it was in Walter and

Fiona's best interest to terminate defendants' parental rights.

 A. Prong One

 The first prong of the best interests of the child standard

requires the Division to establish that "[t]he child's safety,

health, or development has been or will continue to be endangered

by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1).

"[T]he Division must prove harm that 'threatens the child's health

and will likely have continuing deleterious effects on the child.'"

N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013)

(quoting K.H.O., supra, 161 N.J. at 352).

 The harm need not be physical, as "[s]erious and lasting

emotional or psychological harm to children as the result of the

action or inaction of their biological parents can constitute

injury sufficient to authorize a termination of parental rights."

In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing In

re Guardianship of J.C., 129 N.J. 1, 18 (1992)). The focus of the

harm is not on any isolated incident, but rather "the focus is on

the effect of harms arising from the parent-child relationship

over time on the child's health and development." K.H.O., supra,

 15 A-0751-16T3
161 N.J. at 348. "Moreover, '[c]ourts need not wait to act until

a child is actually irreparably harmed by parental inattention or

neglect.'" Div. of Child Prot. & Perm. v. E.D.-O., 223 N.J. 166,

178 (2015) (quoting In re Guardianship of DMH, 161 N.J. 365, 383

(1999)).

 The harm may be established by "a delay in establishing a

stable and permanent home[.]" DMH, supra, 161 N.J. at 383. "A

parent's withdrawal of [] solicitude, nurture, and care for an

extended period of time is in itself a harm that endangers the

health and development of the child." Id. at 379 (citing K.H.O.,

supra, 161 N.J. at 352-54). Additionally, a parent's "persistent

failure to perform any parenting functions and to provide . . .

support for [the child] . . . constitutes a parental harm to that

child arising out of the parental relationship [that is] cognizable

under N.J.S.A. 30:4C-15.1(a)(1) and (2)." Id. (citing K.H.O.,

supra, 161 N.J. at 352-54).

 F.C. argues the trial court erred in its analysis of prong

one of N.J.S.A. 30:4C-15.1(a). She argues she never harmed her

children. She further argues she disclosed her marijuana use, and

never used marijuana in the presence of the children. She states

the trial court failed to account for her depression and bi-polar

disorders. She asserts she benefitted from the Division's

 16 A-0751-16T3
services, which proves a termination of parental rights was

unwarranted.

 W.S. argues the trial court erred in its analysis of the

first prong because there was no evidence presented that his

parental relationship harmed the children or put them at risk. He

contends DCPP failed to assist him in obtaining suitable housing,

and further argues the court impermissibly relied on his

homelessness to prove prong one.

 We are not persuaded by either parent's claims. The trial

court found F.C.'s drug use harmed the children not because it

occurred in their presence, but because F.C. failed to remedy her

substance abuse issues to enable herself to parent the children.

The trial court found F.C.'s

 negative behaviors while in drug treatment
 programs made these programs ineffective and
 led to her discharge. She exhibited
 belligerent attitudes and behaviors in the
 programs that have impacted the children's
 health and development while in her care . . .
 during the children's stay with her at the
 Mommy-and-Me programs and after the children
 were removed and placed in the Division
 custody.

 We likewise reject F.C.'s argument the trial court failed to

account for her untreated mental health issues. The record is

replete with efforts by the Division to secure mental health

treatment for F.C., including medication to address her needs.

 17 A-0751-16T3
However, F.C. failed to follow through in the treatment made

available by the Division.

 W.S.'s track record in treatment was more troubling. Whereas

F.C. enrolled in and was discharged from drug treatment programs,

W.S. failed to attend his treatment or address his drug use

altogether. This lack of engagement limited his ability to have

unsupervised contact with the children. Although the Division

provided W.S. with housing assistance, his homelessness was not

the root cause of the harm to the children. Rather, it was W.S.'s

failure to address his substance abuse as the foundation for his

ability to provide a stable home for the children.

 Because of both parents' failure to address their substance

abuse and mental health issues the trial court concluded:

 Both children have exhibited unstructured
 behaviors and developmental delays resulting
 from the unstable lives of both parents.
 Their continued inattention to the needs of
 the children has and will continue to impair
 the health and development of both children.
 Despite attempts by the Division to remedy the
 instability in the lives of the parents, they
 continue to place their own needs before those
 of the children. A parent's prolonged
 inattention to a child's needs is deleterious
 to the child's relationship with that parent.

The record demonstrates substantial credible evidence Walter and

Fiona's health and development were harmed by the relationship

with F.C. and W.S.

 18 A-0751-16T3
 B. Prong Two

 "The second prong, in many ways, addresses considerations

touched on in prong one." F.M., supra, 211 N.J. at 451. The

focus is on parental unfitness. K.H.O., supra, 161 N.J. at 352;

DMH, supra, 161 N.J. at 378-79. In considering this prong, the

court should determine whether it is reasonably foreseeable that

the parent can cease to inflict harm upon the child. N.J. Div.

of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986). The

second prong may be satisfied

 by indications of parental dereliction and
 irresponsibility, such as the parent's
 continued or recurrent drug abuse, the
 inability to provide a stable and protective
 home, the withholding of parental attention
 and care, and the diversion of family
 resources in order to support a drug habit,
 with the resultant neglect and lack of nurture
 for the child.

 [K.H.O., supra, 161 N.J. at 353.]

"Prong two may also be satisfied if 'the child will suffer

substantially from a lack of . . . a permanent placement and from

the disruption of [the] bond with foster parents.'" F.M., supra,

211 N.J. at 451 (quoting K.H.O., supra, 161 N.J. at 363).

 F.C. argues the trial court erred in its analysis of prong

two and concluding she was unwilling to eliminate the harm to the

 19 A-0751-16T3
children. She asserts her bipolar disorder was not treated, and

she was unable to find a psychiatrist who accepted her insurance,

which precluded her from safely parenting the children.

 W.S. argues the trial court erred in its analysis of the

second prong because the Division failed to account for his

disability and lack of housing. As a result he claims he was

unable to provide a safe and stable home for the children.

 The record does not support either parent's claims. The

Division referred F.C. to eight mental health evaluations. While

under psychiatric care at both Straight and Narrow and Integrity

House, F.C. refused to take medication, chose to discontinue her

medication regimens, and failed to follow-up with available mental

health services. The Division provided F.C. with the contact

information for Bridgeway Services to find a psychiatrist who

accepted her insurance. However, Bridgeway's records indicate

F.C. failed to contact them. F.C. was placed into the Integrity

House program for treatment of cannabis abuse and bipolar disorder.

This program afforded her access to a psychiatrist to obtain

medication, but F.C. refused to comply.

 Similarly, the Division made numerous attempts to engage W.S.

in drug treatment, but he repeatedly failed to attend or was

discharged due to non-compliance. W.S. also consistently tested

 20 A-0751-16T3
positive on his drug screens. And as a result of incidents of

domestic violence involving F.C., W.S. was incarcerated.

 Although each parent blames the Division for their failure

to find stability, a parent's "responsibility for creating [a]

situation . . . cannot be ignored." In re Adoption of Child by

P.S., 315 N.J. Super. 91, 118 (App. Div. 1998). The trial judge's

decision recognized F.C. and W.S.'s exclusive role in creating

their adverse situation. The judge stated:

 Both parents failed to adhere to the
 restrictions set forth on a Safety Protection
 Plan implemented in order to prevent further
 harm to the children. . . . Continued drug
 use and resistance to change makes both of
 these parents unwilling to eliminate the harm
 that such instability has caused and will
 continue to be caused to the children.

The record amply supports the trial court's conclusions that prong

two has been met.

 Also, both parents assert after entry of the judgment the

resource parent requested removal of the children from her care.

Thus, they claim a safe home cannot be guaranteed, thereby creating

a state of "limbo" for the children. They argue a termination of

parental rights is an "unnecessary and unwise" decision, and the

focus should be on reunification. The Division indicates it has

located a pre-adoptive home for the children. Regardless, these

conditions do not invalidate the trial court's findings that both

 21 A-0751-16T3
parents are unwilling to eliminate the harm to the children and

provide them with a safe and stable home.

 C. Prong Three

 Under prong three, the trial court must consider whether "the

[D]ivision made reasonable efforts to provide services to help the

parent correct the circumstances which led to the child's placement

outside the home[.]" N.J.S.A. 30:4C-15.1(a)(3). The Division's

efforts must be analyzed "with reference to the circumstances of

the individual case," including the parent's degree of

participation. DMH, supra, 161 N.J. at 390.

 N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those

reasonable "attempts by an agency authorized by the [D]ivision to

assist the parents in remedying the circumstances and conditions

that led to the placement of the child and in reinforcing the

family structure[.]" The statute lists examples of "reasonable

attempts" at reunification, including but not limited to:

 (1) consultation and cooperation with the
 parent in developing a plan for
 appropriate services;

 (2) providing services that have been agreed
 upon, to the family, in order to further
 the goal of family reunification;

 (3) informing the parent at appropriate
 intervals of the child's progress,
 development, and health; and

 (4) facilitating appropriate visitation.

 22 A-0751-16T3
 [Ibid.]

 F.C. and W.S. both argue the trial court erred in its analysis

of prong three of N.J.S.A. 30:4C-15.1(a)(3). For the first time

on appeal, they claim the Division violated the Americans with

Disabilities Act (ADA), 42 U.S.C. 12101 to 12213, by failing to

accommodate their disabilities through the services it offered.

 Absent plain error leading to the possibility of an unjust

result, we generally decline to consider arguments not raised at

trial. Neider v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

Notwithstanding, we reject defendants' claims because we have

expressly held "the ADA does not provide a defense to a termination

of parental rights proceeding [because] . . . to allow the

provisions of the ADA to constitute a defense to a termination

proceeding would improperly elevate the rights of the parent above

those of the child." N.J. Div. of Youth & Family Servs. v. A.G.,

344 N.J. Super. 418, 442 (App. Div. 2001). Furthermore, "[t]he

Division's efforts in providing classes and parenting programs

must by their very nature take into consideration the abilities

and mental conditions of the parents[,]" but the determination of

reasonableness does not turn on the success of those efforts.

Ibid.

 23 A-0751-16T3
 Here, the record amply demonstrates the Division's efforts

to provide both parents with tailored services to reunify them

with the children. Yet, throughout the five years of the

Division's involvement F.C. and W.S. exhibited consistent non-

compliance with substance abuse treatment and parenting programs

tailored to their individual needs and preferences.

 Despite W.S.'s continued drug use and failure to attend

parenting classes and mental health evaluations, the Division

persisted in referring him to CADC for evaluations and drug tests.

Despite F.C.'s constant discharge from programs, the Division

continued to refer her to CADC for evaluations and enroll her in

new treatment programs to achieve reunification.

 The Division offered both parents visitation. Although F.C.

took advantage of the visitation, she was aggressive with the

children and exhibited poor parenting behavior during visits. W.S.

failed to attend most of the visitation offered by the Division,

and when he did attend he was inattentive to the children.

 The Division explored kinship legal guardianship as an

alternative to termination of parental rights with the relative

resource. However, K.M. declined it because of the disruptive

effect of parental visitation on the children.

 Every factor of N.J.S.A. 30:4C-15.1(c) demonstrating

reasonable efforts was met. The record offers no support for the

 24 A-0751-16T3
parents' claims the Division did not make reasonable efforts to

provide services.

 D. Prong Four

 The fourth prong of the best interests of the child standard

requires the Division to show that termination of "parental rights

will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4).

Termination of parental rights poses a risk to children due to the

severing of the relationship with their natural parents, but it

is based "on the paramount need the children have for permanent

and defined parent-child relationships." K.H.O., supra, 161 N.J.

at 355 (quoting N.J. Div. of Youth & Family Servs. v. J.C., 423

N.J. Super. 259, 266 (App. Div. 2011)).

 Thus, "the fourth prong of the best interests standard [does

not] require a showing that no harm will befall the child as a

result of the severing of biological ties." Ibid. Prong four

"serves as a fail-safe against termination even where the remaining

standards have been met." G.L., supra, 191 N.J. at 609. "[T]he

question to be addressed under [prong four] is whether, after

considering and balancing the two relationships, the [children]

will suffer a greater harm from the termination of ties with

[their] natural parents than from permanent disruption of [their]

relationship with [their] foster parents." I.S., supra, 202 N.J.

 25 A-0751-16T3
at 181 (citations omitted). "'[T]o satisfy the fourth prong, the

[Division] should offer testimony of a well qualified expert who

has had full opportunity to make a comprehensive, objective, and

informed evaluation of the child's relationship with both the

natural parents and the foster parents.'" F.M., supra, 211 N.J.

at 453 (citations omitted).

 F.C. alone challenges the trial court's finding under prong

four of N.J.S.A. 30:4C-15.1(a). Specifically, she claims because

neither Dr. Kanen nor Dr. Burr conducted psychological evaluations

of the children, their evaluations are incomplete, and prong four

has not been met. We disagree.

 After conducting a psychological evaluation of F.C., Dr.

Kanen concluded she had severe parenting and behavioral deficits,

and the children's attachment to her was insecure. The trial

court recited the expert's findings:

 [Dr. Kanen] opined that [F.C.'s] capacity to
 cope with the demands of daily life and
 childcare is evenly impaired. He describes
 her as disconnected with paranoid ideation,
 obstructive behavior and chronic anger. He
 concluded that [F.C.] is not capable of
 providing her children with a permanent, safe
 and secure home now or in the foreseeable
 future.

The trial court credited Dr. Kanen's testimony that the children

have severely impaired attachments to F.C., and that they should

have no contact with her because of her anger.

 26 A-0751-16T3
 Dr. Burr also opined the quality of F.C.'s relationship with

the children was not adequate to achieve permanency. The trial

court summarized his testimony that F.C.'s "drug use negatively

impacts on her overall functioning and on her parenting." The

trial court also found credible Dr. Burr's testimony that "[F.C.]

did not exhibit an understanding of the children's needs and has

no understanding of how the children are doing in their treatment

programs."

 F.C.'s own expert, Dr. Brown, suggested she did not exhibit

the mental competence to protect her children from harm. As the

trial court noted, Dr. Brown "recommended psychiatric management

and attendance at weekly individual psychological therapy for at

least [four] months or [sixteen] sessions [for F.C.] [while]

simultaneously submitting monthly negative urine samples." Dr.

Brown also concluded the children were not securely bonded to F.C.

 We are unconvinced psychological evaluations of the children

were either necessary or dispositive of the findings regarding the

status of F.C.'s mental health and ability to parent. The evidence

in the record regarding the children's mental health demonstrates

both Walter and Fiona suffered from mental health deficits, which

would only be exacerbated by the parental relationship.

Conversely, Drs. Kanen, Burr, and Brown all agreed the structured

relationship with the resource parent was beneficial to the

 27 A-0751-16T3
children. Thus, the termination of parental rights followed by

adoption would not do more harm than good.

 Affirmed.

 28 A-0751-16T3