# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3669-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.R.,

     Defendant-Appellant,

and

D.T.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.L.J.R.,

     a Minor.

_____

       Argued March 25, 2019 – Decided April 8, 2019

       Before Judges Sabatino and Mitterhoff.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0118-18.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Ashley L. Davidow, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ashley L. Davidow, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

D.R., the mother of K.L.J.R. ("Kendrick"),[1] appeals the April 3, 2018 final judgment of guardianship terminating her parental rights after a trial in the Family Part. We affirm.

The mother gave birth to Kendrick in October 2014. Kendrick's father is D.T., whose whereabouts are not clear and who has not been involved in the child's life. The mother has two older children, a son Y.T. ("Yusef") who is in

---

[1] We use initials and pseudonyms in this opinion to safeguard the privacy of the children. R. 1:38-3(d)(12).

the custody of his paternal grandfather, and a daughter A.J. ("Angie") as to whom the mother has surrendered her parental rights.

The Division of Child Protection and Permanency ("the Division") became involved with the mother before the birth of Kendrick for various reasons, including her having reported suicidal ideations at a shelter and having been arrested for shoplifting. The mother has been diagnosed with bipolar I disorder and other mental health disorders. She has persisting drug abuse problems and has repeatedly tested positive for marijuana as well as opioids during much of the litigation.

Kendrick was removed from the mother's care by the Division at the age of one in October 2015. Kendrick was placed in a resource parent's residence, where he manifested behavioral issues. The resource parent did not want to keep or adopt Kendrick so the Division proceeded on a court-approved path of terminating the mother's parental rights and select home adoption.

Meanwhile, the Division arranged supervised visits with the mother, many of which she either missed or arrived for late. During the supervised visits, the mother was observed engaging, at times, in inappropriate behavior.

The Division found no suitable local relatives to step in as alternative caretakers. One relative in California whom the mother identified moved to Las

Vegas and never provided contact information. The mother alternatively suggested as a caretaker Yusef's grandfather (with whom she had been living for a period of time), along with several other persons who for various reasons were not appropriate caretakers. There is no indication in the record that Yusef's grandfather (who has no biological connection with Kendrick) was willing to take Kendrick into his home. The Division did not perform a home visit by the mother because it thought it would not be feasible to allow her to care for Kendrick there.

The Division presented at trial testimony from a caseworker, who described the relevant chronology and the litany of services the Division provided to the mother.

The Division also presented unrebutted expert testimony of Dr. Linda Jeffrey, a psychologist. Dr. Jeffrey confirmed the mental health diagnoses of the mother. She found it significant that the mother had not been in sustained remission from her drug problems for over a year. She opined that the persisting drug use was detrimental to her ability to parent Kendrick and indicative that the mother would not be fit to take care of him. The expert performed a bonding evaluation, in which Kendrick exhibited only an "insecure" attachment to his mother.

4

The mother testified on her own behalf. She attempted to explain her efforts to combat her drug problems and stabilize her life. The mother presented no competing expert testimony or other fact witnesses.

After hearing the evidence, the trial judge, Hon. Francine I. Axelrad, applied the four statutory factors that govern the termination of parental rights in Title 30 litigation. Those four factors are:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four controlling standards later codified in Title 30).]

The judge concluded that the Division established all four of these factors by the requisite standard of clear and convincing evidence. The judge detailed her analysis in an oral opinion she read into the record on April 3, 2018. Essentially, the judge regarded the mother's efforts to become a fit caretaker as being "too little too late." The judge found that it was in the child's best interests to terminate parental rights to allow for the opportunity to be adopted by some other family. The judge entered a final judgment of guardianship that day as to both parents.

The mother filed a timely notice of appeal. The father has not appealed. While the appeal was pending, the Division's attorney submitted an update letter in August 2018 pursuant to Rule 2:6-11(f), informing this court that Kendrick had been removed from his previous resource home and had been placed in a "prospective adoptive home" with his sister Angie.[2] The resource parent is apparently a friend of the mother's family.

On appeal, the mother contends that the Division failed to meet its burden of proof at trial as to all four statutory factors. Among other things, the mother argues that the Division, the testifying expert Dr. Jeffrey, and the trial court

___

[2] At oral argument on appeal in March 2019, the Division's counsel represented that Kendrick remains in that same home with Angie, who has been adopted by the resource parent.

A-3669-17T3

placed undue emphasis on her past drug use, stressing that she maintained four months of sobriety before the trial. The mother contends that she has not harmed Kendrick or caused him a "concrete emotional or physical injury." She maintains that if she was provided sufficient housing assistance, she could provide him with a safe and stable home.

The mother further emphasizes that she has visited with Kendrick for over one hundred hours while he has been in the Division's care and custody and contends there is an attachment between them that should not be severed. The mother also contends that Kendrick's behavioral problems that were noted at trial may stem from substandard conditions at the resource home.

In sum, the mother urges that the child's best interests lie with maintaining her parental rights. The Division and the Law Guardian oppose her arguments and advocate in favor of affirming the trial court's decision so that Kendrick can be adopted.

In evaluating these arguments, we are guided by well-settled principles. We recognize that parents inherently "have a constitutional right to raise their children." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012). However, that right is qualified by the State's overreaching responsibility to protect the welfare of children. In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

A-3669-17T3

The termination of parental rights is a measure of "last resort," limited to cases of established neglect or harm or when a parent has been demonstrated to be unfit. F.M., 211 N.J. at 447. The ultimate focus of a guardianship trial under the Title 30 factors for termination is the best interests of the child. Ibid.

On appeal, our scope of review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. Such deference is required because of the trial court's "superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448. On appeal, the Family Part judge's factual findings should not be overturned "unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." Ibid.

Applying these principles, we affirm the final judgment of guardianship, essentially for the sound reasons articulated by Judge Axelrad in her oral opinion. We add only a few amplifying comments.

The factual and expert proofs the Division presented at trial comprise substantial credible evidence to support the judge's findings as to each of the

four statutory factors for termination. The mother's persisting serious mental health issues, long-term drug dependency, and failure to provide a stable home for Kendrick are well documented in the record. The mother's recent short-term abstinence from drugs and her expectation of receiving future housing assistance do not compel a contrary conclusion. The Division offered reasonable services to the mother, even though she did not take full or consistent advantage of them.

In addition, although the trial judge recognized the mother's efforts to visit her son, the unrebutted expert testimony of Dr. Jeffrey showed that Kendrick displayed only an "insecure attachment" with his mother. Terminating her parental rights, according to Dr. Jeffrey, would not cause the child "serious and enduring harm." The expert opined that it would not be safe to return Kendrick to his mother, who continues to be noncompliant with treatment for a mental health disorder and who has not been in "sustained remission" from drug use for a sufficiently long period.

All in all, the Division's proofs were ample to justify termination in this case. The trial court's decision was sufficiently grounded in the evidence and consistent with legal principles. The post-judgment developments of Kendrick's placement in an adoptive home with his sibling, although not dispositive of the appeal, only strengthens the rationale for termination. The trial court's decision

9

appropriately serves the important objective of achieving permanency for a child who has been neglected.  See, e.g., <u>N.J. Div. of Youth & Family Servs. v. S.F.</u>, 392 N.J. Super. 201, 209-10 (App. Div. 2007); <u>see also</u> <u>N.J. Div. of Child Prot. & Permanency v. R.L.M.</u>, 236 N.J. 123, 146-47 (2018) (emphasizing the importance of prompt judicial determinations of issues in cases involving children awaiting permanency).

As a final subject, we briefly comment regarding the conditions of Kendrick's former resource home, a concern raised in the appellate briefs of both the mother and the Law Guardian.  The contact sheets in the record indicate that Kendrick was in a resource home that was overcapacity with as many as eight children, where Kendrick was sharing a bedroom with two other children.[3]  In addition, the contact sheets reflect that a caseworker one day saw bumps on Kendrick's arms and legs, which a Division nurse subsequently determined to be flea bites.  The records further indicate that the resource home allowed a sippy cup used by Kendrick to become moldy.  A caseworker agreed the cup

---

[3]  Apparently, the resource family had been granted some form of administrative waiver from occupancy limits for "emergency placements."  One of the contact sheets indicates that the resource family was expecting two of the children to be leaving the premises soon.

was unacceptable to use. She photographed the cup, and explained she would speak with the resource parent about the issue.

On the other hand, the Division's attorney notes that several caseworker visits to the resource home indicated the house was clean and orderly, and adequately stocked with food. In addition, Kendrick was observed to be in clean and appropriate clothing. When Kendrick became ill with a fever and had a seizure, the resource mother appropriately took him to a hospital emergency room.

Regardless of their actual severity or duration, the somewhat worrisome conditions at the resource home noted by defense counsel and the Law Guardian do not alter our conclusion to uphold the trial court's assessment of the four statutory factors. However, we trust the Division has taken or will take appropriate action to assure that any substandard conditions at the resource home do not persist. See generally N.J.S.A. 30:4C-27.3 to -27.9; N.J.A.C. 3A:14-1.1 to -5.6; N.J.A.C. 3A:17-1.1 to -2.7; N.J.A.C. 3A:51-1.1 to -8.1.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3669-17T3