# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1864-18T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.P.,

     Defendant,

and

J.H.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.H.,

     a Minor

_____

Submitted December 12, 2019 – Decided January 3, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0041-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Albert Manuel Afonso, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Viviane Cristina Sullivan, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for the minor (Melissa R. Vance, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant J.H. (John[1]) appeals from the December 17, 2018 order of the Chancery Division terminating his parental rights to his son, J.H. (Jake). We affirm.

I.

Jake was born in October 2011 to defendants John and J.P. (Joan).[2] In August 2015, the Division of Child Protection and Permanency (DCPP or

---

[1] Pseudonyms are used to avoid confusion of the parties and to protect the anonymity of the child. R. 1:38-3(d).

[2] For simplicity, much of Joan's history with Jake is omitted because Joan voluntarily surrendered her parental rights to Jake before trial.

Division) received a referral regarding an incident where Jake's maternal grandmother refused to give Jake to Joan. The maternal grandmother was concerned Joan's instability and possible drug use were a danger to the child. Joan became hostile with the maternal grandmother and police officers who were called to the scene.

The Division investigated the family and sought information regarding John's criminal record and substance abuse history. At the time, John was on probation and was required to attend substance abuse services. He refused to submit to a substance abuse evaluation and would not sign releases allowing the Division to contact his probation officer to determine his compliance with substance abuse restrictions. As a result, the Division filed a complaint in the Chancery Division for an order to obtain substance abuse assessments and releases from both parents. The court ordered the parents to undergo substance abuse evaluations, psychological examinations, domestic violence counseling, parenting skills training, and random urine screenings.

On November 16, 2015, the Division filed an order to show cause for care and supervision of Jake, which the trial court granted to ensure the parents engaged in services. Despite an order to comply, John missed five substance abuse evaluations between November 2015 and January 2016.

In February 2016, after a urine screen positive for tetrahydrocannabinol (THC), the active ingredient in marijuana, Oxycodone, and benzodiazepines, a psychologist evaluated John. He admitted he took Oxycodone prescribed for someone else, smoked marijuana daily, and had two prescriptions for Percocet from different physicians. The psychologist recommended John attend substance abuse treatment and parenting classes, and submit to urine screens.

On February 9, 2016, the court approved the Division's continued care and supervision of Jake based on the parents' inability to parent the child due to substance abuse and ordered the parents to undergo substance abuse treatment.

On April 13, 2016, John entered a substance abuse treatment program, where he also received parenting and anger management training. He refused, however, to cooperate with the Division's random urine testing and tested positive for THC in a court-ordered test. In April 2016, after being granted temporary custody of Jake, the Division placed him with his maternal grandmother, with John retaining visitation rights. Prior to that time, the parents repeatedly left the child in the care of his maternal grandmother.

During both his April and May 2016 visits with Jake, John wanted to leave early. He tested positive for THC twice in May 2016. Also, John was discharged from his treatment program in June 2016 for non-attendance.

In July 2016, Jake was returned to Joan's custody. In August 2016, John failed to show for three visits with Jake and tested positive for THC twice. In September 2016, John failed to attend two visits with Jake and refused to undergo a urine screening twice.

On September 23, 2016, the trial court granted the Division custody of Jake. The Division returned him to his maternal grandmother. The trial court ordered both parents to undergo substance abuse evaluations.

On November 28, 2016, John attended a substance abuse evaluation where he reported using marijuana daily from age sixteen to a few months before the evaluation. The evaluation found John suffered from "severe cannabis use disorder."

On December 7, 2016, John received an updated psychological evaluation from his initial psychologist, who recommended the same services as the prior assessment. On December 12, 2016, John failed to show for Jake's visit and refused to submit to a random urine screen. Later that month, John provided a urine screen, which came back negative.

On January 13, 2017, John was unable to visit Jake because he was remanded to jail for four days after violating probation. In February and March 2017, John failed to attend three visits with Jake.

A-1864-18T4

On May 9, 2017, John was referred to the Bergen Family Center to receive therapy, and he attended an intake session.  On May 25, 2017, John failed to undergo a hair and nail drug test.  On July 12, 2017, John was arrested for possession of marijuana.  On September 26, 2017, the Bergen Family Center closed John's case because of his failure to attend.

John violated probation in February, March, April, June, August, and September 2017.  He spent several days in jail for each violation.

On October 12, 2017, the court approved the Division's permanency plan for termination of John's parental rights, followed by adoption by Jake's maternal grandmother.  The court had previously granted two extensions of the permanency plan to afford the parents an opportunity to demonstrate stability.  On November 22, 2017, the Division filed a complaint for guardianship.

In November and December of 2017, John failed to appear for four drug tests.  On January 24, 2018, John was incarcerated for a week after violating probation.

On February 5, 2018, John began attending treatment through another substance abuse provider.  As part of this program, a psychologist evaluated John in April and May 2018.  After interviewing him, the psychologist found John "lack[ed] in empathy, especially for [Jake], and [was] markedly self-

centered." Moreover, the psychologist found John to be a "highly evasive, manipulative individual with a history of antisocial behavior and drug abuse," who presented as "highly narcissistic and self-absorbed," and "emotionally blunted . . . ."

John violated probation for testing positive for illegal substances in January, February, March, and April 2018. He served several days in jail for each violation.

Trial commenced on July 26, 2018. Because Joan entered an identified surrender of her parental rights to Jake's maternal grandmother, only John's parental rights were at issue. At the time of trial, John had recently been arrested for possession of marijuana. He had also been noncompliant with court-ordered random screens sought by the Division. His visitation with Jake was inconsistent and disengaged. John relied on his mother for housing and transportation, had an inconsistent employment history, and no realistic plan to provide for the care and supervision of Jake.

Two Division caseworkers recounted John's failure to refrain from substance abuse, repeated incarceration, failed efforts at rehabilitation, and noncompliance with drug testing.

A psychologist called by the Division offered the opinion Jake exhibited signs of post-traumatic stress disorder. According to the expert, stability was the most important objective for Jake's well-being. The child needed to stop worrying about visits with his parents and to see the world as a "safe, predictable place." The expert testified Jake's maternal grandmother had the ability to provide for Jake's needs, while John lacked that ability and would not have it in the foreseeable future.

On December 17, 2018, Judge Jane Gallina-Mecca issued a sixty-four-page written opinion terminating John's parental rights to Jake. The judge found the Division's three witnesses to have been credible and concluded the agency established the four statutory prongs for terminating parental rights by clear and convincing evidence. See N.J.S.A. 30:4C-15.1(a).

As to the first prong, the judge found the Division had established Jake's safety and health has been and will continue to be endangered by John's substance abuse, lack of interest in Jake, failure to complete therapy, criminal behavior, inconsistent employment history, and inability to provide for the child's safety and security.

As to the second prong, the judge found the Division established John had not ameliorated the harm he posed to Jake and would be unable to continue a

parental relationship with the child without harming him. The court accepted the expert's testimony Jake has symptoms of post-traumatic stress disorder resulting from his parents' acts, and permanency was vital to his well-being. The judge found "it [] abundantly clear that [John] has not established a sufficiently safe and stable lifestyle to be able to eliminate or avoid the harm that would threaten [Jake] were [Jake] to be placed in his custody." The judge continued, "[t]here [was] not a scintilla of evidence to suggest that [John] is able to eliminate the harm facing [Jake] and provide him a safe a stable home within a reasonable time."

As to the third prong, the judge found the Division had made reasonable efforts to provide services to correct the circumstances which led to Jake's placement outside of the home and considered alternatives to termination of John's parental rights.

As to the fourth prong, the court found termination would not do more harm than good based on the "uncontroverted expert testimony and evidence adduced at trial." The judge relied on the psychologist's testimony that Jake's maternal grandmother was the most stable and consistent adult in Jake's life. The court also found that although losing a parental relationship would impact Jake negatively, his need for stability was more critical to his well-being, and

his maternal grandmother could mitigate the harm caused by termination of John's parental rights. Finally, the court concluded it would be traumatic for Jake to be separated from his maternal grandmother.

This appeal followed. John raises the following arguments for our consideration:

> THE JUDGMENT OF GUARDIANSHIP SHOULD BE REVERSED BECAUSE THE COURT MISAPPLIED THE LAW IN FINDING THAT DCPP MET ITS BURDEN OF PROOF UNDER THE SECOND AND FOURTH PRONGS OF THE "BEST INTEREST" STANDARD PURSUANT TO N.J.S.A. 30:4C-15.1.
>
> > A. THE TRIAL COURT MISAPPLIED THE PREVAILING LEGAL STANDARDS UNDER THE SECOND PRONG OF THE "BEST INTEREST" STANDARD AND [SIC] WHERE JOHN DEMONSTRATED THAT HE COULD PROVIDE SAFE CARE FOR HIS SON.
> >
> > B. THE COURT ERRED IN HOLDING THAT DCPP'S EVIDENCE ESTABLISHES THAT TERMINATION OF PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD.

II.

Our scope of review on appeal from an order terminating parental rights is limited. <u>N.J. Div. of Youth & Family Servs. v. G.L.</u>, 191 N.J. 596, 605 (2007).

We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they

relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

(1)  The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2)  The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm.  Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3)  The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4)  Termination of parental rights will not do more harm than good.

John challenges only the court's determination the Division satisfied the second and fourth prong of the statutory test.  As to the second prong, John argues, because the court's decision was issued five months after trial, the judge did not consider his post-trial compliance with drug treatment.  John argues a

remand for further factfinding is warranted. He also argues there was no indication in the record his drug use threatens to harm Jake.

As to the fourth prong, in addition to arguing the court erred for failing to consider his post-trial compliance with drug treatment, John argues his relationship with Jake in July 2018 was not necessarily the same as it was at the time of the court's decision, warranting a remand. Finally, John argues the judge erred in relying on the psychologist's May 2018 opinion because the passage of time between the trial and issuance of the court's decision made the expert's opinion unreliable.

After carefully reviewing John's arguments in light of the record and applicable legal principles, we are convinced there is adequate, substantial, credible evidence supporting Judge Gallina-Mecca's findings of fact. We also agree with her legal conclusion the Division satisfied all of the statutory requirements for termination of John's parental rights to Jake. We therefore affirm the December 17, 2018 order for the reasons stated in Judge Gallina-Mecca's comprehensive written opinion. We add the following comments.

Under the second statutory prong, the trial court was required to determine whether it is "reasonably foreseeable that the parents can cease to inflict harm upon the [child] . . . ." N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J.

591, 607 (1986). The court considers "whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).

We find no error in the trial court's determination based on the unrebutted testimony of the fact witnesses and the expert psychologist that John was unable or unwilling to eliminate the harms that caused Jake to be removed. John was uncooperative with substance abuse treatment for several years prior to trial. His frequent incarceration greatly inhibited his inability to provide a safe, stable, and predictable home for Jake. John offered no realistic plan for providing such a home for Jake in the foreseeable future. Moreover, the record firmly establishes Jake's maternal grandmother is the only consistent parental figure he knows and has provided him with a stable and secure home. Removing Jake from that supportive environment for the uncertainty of a future with his father would be contrary to the child's best interests.

We also find no merit in John's argument the trial court erred because it did not consider his post-trial drug treatment compliance and relationship with Jake. John's argument is based on speculation. He offers no evidence of his

successful completion of a substance abuse treatment program, consistent refraining from the use of illegal substances, or a realistic plan to provide a stable and secure home for Jake. Nor does John explain why, after Jake has waited years for his father to provide him with a secure home, the child's interests would be served by a further delay in permanency.

Under the fourth statutory prong, the question before the court is whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "Prong four 'serves as a fail-safe against termination even where the remaining standards have been met.'" E.P., 196 N.J. at 108 (quoting G.L., 191 N.J. at 609). "It has been 'suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future.'" Ibid. (quoting A.W., 103 N.J. at 610 (alterations in original) (quotation omitted)).

"[P]ermanent placement with a loving family" is the goal where "reunification is improbable . . . ." Ibid. However, "courts have recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." Id. at 109 (citing A.W., 103 N.J. at 610–11). As the Court observed in A.W., "th[is] detriment may be greater than keeping the

parent-child relationship intact since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place." 103 N.J. at 611.

We find no error in Judge Gallina-Mecca's conclusion that termination of John's parental rights would not do more harm than good. During the years John was struggling with his drug use and frequent incarcerations, Jake's maternal grandmother took care of the child. The court accepted the expert's opinion that if Jake's bond with his maternal grandmother was severed, he would suffer "long[-]lasting, intense negative reactions" similar to "a death of a parent." John offered no reasonably likely plan to ameliorate that harm by providing a secure and supportive home for Jake. We are satisfied with the trial court's finding that the fourth prong was satisfied by clear and convincing evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1864-18T4