# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3545-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.L.P.,

     Defendant-Appellant,

and

B.P.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.P.,
a minor.

_____

Submitted January 15, 2025 – Decided January 28, 2025

Before Judges Mayer and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0011-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Mark E. Kleiman, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Lakshmi R. Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant S.L.P. (Mother) appeals from the June 26, 2024 judgment of the Family Part terminating her parental rights to her daughter M.P.[1] We affirm.

## I.

M.P. was born in 2020 to Mother and defendant B.P. (Father). Plaintiff Division of Child Protection and Permanency (DCPP or Division) became involved with the family soon after M.P.'s birth when she tested positive for

---

[1] We use initials to protect the privacy of records relating to these proceedings. R. 1:38-3(d)(12).

substances related to Mother's Methadone treatment and prescribed medications. DCPP closed that case after determining M.P. did not have unauthorized substances in her system. At that time, M.P. was in Mother's custody and both were living at the home of S.P. (Grandmother) and J.P. (Grandfather), M.P.'s maternal grandparents. Father was no longer living with the maternal grandparents because he damaged Grandmother's car while driving under the influence

In September 2021, the Division received a referral that Mother and M.P. were residing with Father in a homeless shelter for men. Mother stated that she and the child were residing with the maternal grandparents. The Division closed the case.

In June 2022, the Division received a referral from the State Police that Mother and Father were using methamphetamines and there was domestic violence in their home. Mother tested positive for illegal substances and Father, who had fresh needle marks, refused to provide a urine sample.

In September 2022, Mother met with a domestic violence liaison regarding her relationship with Father. A month later, DCPP received a referral related to allegations of Mother's substance abuse. Those allegations, and Mother's and Father's refusals to submit urine screens, led to DCPP's

implementation of a Safety Protection Plan (SPP) for M.P. The plan required Mother and Father to be supervised by the maternal grandparents whenever in the presence of M.P.

On October 17, 2022, the Division filed a complaint in the Family Part seeking care and supervision of M.P. On November 1, 2022, the trial court granted DCPP care and supervision of M.P. The court ordered Mother and Father to undergo substance abuse and psychological evaluations, as well as drug tests. Father tested positive for benzodiazepines, amphetamines, and buprenorphine that day.

On November 9, 2022, DCPP received notice that Mother may be spending time with M.P. while unsupervised, in violation of the SPP. A DCPP caseworker responded to the maternal grandparents' home, where M.P. and Mother were residing at the time, and found Mother unsupervised with M.P. While at the home, a caseworker observed pill bottles on the floor within reach of M.P. Grandmother also showed the caseworker baggies containing a white substance and marijuana, as well as a bottle of urine. The Division learned that two-year-old M.P., who was naked and without a diaper, had not been seen by a physician since she was four months old.

A-3545-23

Grandmother stated she no longer was willing to supervise Mother when she was with M.P. That day, DCPP effectuated an emergency Dodd removal of M.P.[2]

On November 14, 2022, the trial court granted DCPP custody of M.P. The child was placed in a non-relative home due to allegations by Mother that Grandmother was an alcoholic, which Mother later admitted to fabricating. M.P. was thereafter placed with the maternal grandparents as her resource parents where she remained through trial. The Division offered Mother regular supervised visitation with the child at its office.

Grandmother and Grandfather expressed, after discussing other options, including kinship legal guardianship (KLG), with a DCPP representative, that they preferred to adopt M.P. over KLG. The Division considered other relatives identified by Mother as potential resource parents for M.P. None were found to be willing and able to care for the child.

In the following months, Mother was minimally compliant with court-ordered urine and hair follicle drug tests, and on one occasion was suspected of tampering with or diluting her urine sample. When she did submit to testing,

---

[2] A Dodd removal is an emergency removal of a child from a parent's custody without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

A-3545-23

Mother was frequently found to have ingested controlled substances. A hair follicle test in November 2022 tested positive for Fentanyl and methamphetamines. In October 2023, Mother tested positive for Fentanyl, amphetamines, methamphetamines, and cocaine. Mother's substance abuse evaluation recommended treatment with Solstice Counseling and Wellness Center, which began on January 31, 2023. She was discharged on March 6, 2023, after missing two full weeks of treatment and failing to provide urine tests.

Mother thereafter intermittently sought drug treatment with the help of DCPP, which connected her with Burlington Comprehensive Counseling. However, she continuously missed appointments. Mother also attended inpatient drug treatment at Maryville Integrated Care, but she left before completing the program. She also attended inpatient drug treatment at Pyramid Healthcare in 2023, but was discharged for inappropriate physical contact with another patient. While at Pyramid, Mother admitted to daily heroin use.

Mother often arrived late or did not attend DCPP-facilitated visitation with M.P. She would "go missing for weeks" and attended no scheduled visits with M.P. at DCPP's office between July 28, 2023, and December 19, 2023. When Mother attended visits, she showed concerning behavior, including nodding off, smelling of substances and cigarettes, and having no food. In

6

March 2023, M.P. started vomiting and became lethargic during a visit, raising concerns that she had ingested a substance. Tests established the child had ibuprofen and aspirin in her system, as did Mother.

DCPP referred Mother to Ascenda Parent Support Services, but she was discharged in March 2023 after missing multiple appointments. The Division also referred Mother to Oaks Integrated Care for parenting services, but she was ultimately discharged and barred from the premises.

A December 2000 psychological evaluation recommended Mother receive cognitive behavioral therapy. Although the Division arranged for the therapy, Mother failed to attend. Mother received some treatment for opiate use disorder, anxiety, post-traumatic stress disorder, and attention deficit/hyperactivity disorder.

Mother additionally did not heed recommendations from her domestic violence liaison, and repeatedly declined DCPP's offers to refer her to domestic violence housing.

In late 2023 and early 2024, Mother missed or arrived late to visits with M.P., missed appointments for DCPP-referred parenting services, and tested positive for illicit substances. She also submitted multiple adulterated urine samples that were unable to be tested.

In December 2023, DCPP filed a complaint in the Family Part seeking termination of Mother and Father's parental rights and guardianship of M.P. The court appointed a Law Guardian to represent M.P.

The court held a five-day trial. DCPP called as witnesses its caseworkers, as well as an expert in clinical and forensic psychology. The Law Guardian also called an expert in clinical and forensic psychology. Mother did not attend the trial.[3]

The caseworkers testified to their reports and contacts with Mother, as well as her behavior. They also testified about their contacts with the maternal grandparents and their discussions regarding KLG and adoption.

The Division's expert emphasized M.P.'s need for permanency and "predictability in her lifestyle and in her world." He evaluated Mother, and conducted a bonding evaluation between her and M.P., as well as between M.P. and her resource parents. Based on his psychological evaluation of Mother, the expert opined she did not have the ability to provide M.P. with the necessary and crucial elements of a positive and significant bond between parent and child. The expert testified that Mother has limited knowledge of parenting and was

_____

[3] Father also did not appear at trial and did not appeal the judgment terminating his parental rights to M.P.

A-3545-23

unable to identify significant milestones in a child's life. He found M.P. had an "ambivalent attachment" to Mother, which "is not a significant positive bond." The expert could not support Mother as an independent caretaker of M.P. in the foreseeable future.

The Division's expert described the bond between M.P. and Grandmother as a "significant and positive psychological attachment and bond," with a "significant risk" of M.P. "suffering severe and enduring harm" if the attachment was permanently ended.

The Law Guardian's expert testified that during her evaluations, Mother was dismissive and denied substance abuse issues. The expert stated that Mother told her she did not plan on leaving Father in the foreseeable future, despite domestic violence and mental, physical, emotional, verbal, and psychological abuse. The expert opined that, given Mother's behavior, and the possibility that she will "start and stop[]" any positive changes she may make to her behavior as she has done in the past, prognosis for her ability to parent M.P. in the foreseeable future is "poor."

The Law Guardian's expert testified that delaying permanency for M.P. would be "contraindicated to her best interest as it relates to her psychological and emotional well[-]being," and there would be no harm to M.P. if Mother's

9

parental rights were terminated "[a]s long as she was safely cared for by persons who she deems as her psychological parents." The expert opined that M.P. and her maternal grandparents enjoy a "secure" bond.

The Law Guardian's expert also testified that during her interview with the maternal grandparents, they consistently expressed their intention to adopt M.P. over KLG, with Grandmother being particularly clear on that subject. Grandmother expressed concerns for M.P.'s safety if Mother were to have unsupervised access to the child. The expert also testified that the maternal grandparents intended to permit Mother to maintain a relationship with M.P., provided their visits are supervised and outside of their home because Mother had stolen from the maternal grandparents in the past.

On June 26, 2024, Judge Mary Ann O'Brien issued a comprehensive oral opinion in which she concluded that DCPP had satisfied each of the four prongs set forth in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, and that termination of Mother's parental rights to M.P. was warranted. A June 26, 2024 judgment memorialized Judge O'Brien's decision.

This appeal followed. Mother argues the trial court erred when it found DCPP: (1) satisfied prong three of N.J.S.A. 30:4C-15.1(a) because the Division did not follow the recommendation of its expert that Mother undergo a

psychiatric evaluation by a board-certified psychiatrist or other qualified provider to determine whether she should be offered psychotropic medications; (2) adequately considered KLG as a viable alternative to termination of Mother's parental rights; and (3) satisfied prong four of N.J.S.A. 30:4C-15.1(a) because it did not give Mother additional time to address the issues that resulted in the child's removal. The Law Guardian supports the judgment.

II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104

11

(2008) (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

> (1)    The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)    The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3)    The division has made reasonable efforts to provide services to help the parent correct the

circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

After carefully reviewing Mother's arguments in light of the record and applicable legal principles, we are convinced there is no basis to disturb Judge O'Brien's well-reasoned decision that DCPP established by clear and convincing evidence that termination of Mother's parental rights to M.P. was warranted.

We see no support in the record for Mother's argument that the Division failed to satisfy prong three of N.J.S.A. 30:4C-15.1(a). Mother argues a psychiatric evaluation may have revealed the pathologies that led to M.P.'s removal from her care and prevent reunification, and psychotropic medication may have effectively addressed those pathologies. The Division's expert testified that he recommended a psychological evaluation for Mother's "personal benefit" and that his recommendation was "not offered with the intent of trying to effectuate reunification of this child with this birth mother," given Mother's poor prognosis for change.

Nor do we find support in the record for Mother's argument regarding KLG. There is no statutory bar to granting KLG instead of adoption where the relative caregiver wants to adopt and DCPP otherwise proves termination of

parental rights to be in the child's best interests. The record supports the trial court's finding that the maternal grandparents were informed KLG was an option and elected to adopt M.P. in light of the significant concerns raised by Mother's interaction with the child and her history of negative interactions with her parents, including theft of their property and a false accusation that caused them to be temporarily separated from M.P.

We also are not persuaded DCPP was compelled to give Mother additional time to address the numerous issues that caused it to remove M.P. from her care.

We therefore affirm the June 26, 2024 judgment for the reasons stated in Judge O'Brien's comprehensive oral opinion. Mother's arguments are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3545-23