# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1278-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

G.A.,

     Defendant-Appellant,

and

M.F.,

     Defendant.

_____

IN THE MATTER
OF G.A., a minor.

_____

Submitted March 17, 2025 – Decided June 5, 2025

Before Judges Gummer, Berdote Byrne, and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0158-22.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Daniel A. DiLella, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Wesley Hanna, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor G.A. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, Designated Counsel, on the brief).

PER CURIAM

Defendant G.A. ("Geoffrey"),[1] the father of G.A. ("Gloria"), appeals the final judgment of abuse and neglect entered against him on April 5, 2023.[2] The

---

[1]  We use initials and pseudonyms in this opinion to protect the privacy of those involved and because records relating to Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

[2]  In his notice of appeal, defendant also identified as an order from which he was appealing a November 15, 2023 order terminating the litigation and barring him from having contact with Gloria.  In his appellate briefs he did not raise or address issues regarding the termination of the litigation or other directives set forth in that order.  Accordingly, we deem those issues waived and do not address them.  See Green Knight Cap., LLC v. Calderon, 469 N.J. Super. 390, 396 (App. Div. 2021) (declining to reach an issue plaintiff had failed to raise or brief on appeal); N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501,

trial court entered that judgment after determining the Division of Protection & Permanency ("DCPP" or "Division") had met its burden of proof under N.J.S.A. 9:6-8.21(c) based on evidence Geoffrey had sexually abused Gloria. We affirm, substantially for the reasons expressed by Judge Garry J. Furnari in the comprehensive oral opinion he set forth on the record on April 5, 2023.

I.

In 2016, Geoffrey immigrated from Haiti with his son and daughter, Gloria, who was born in 2011. Gloria's mother, M.F., remained in Haiti and is not a party to this appeal. In March 2022, Gloria moved into the home of a family friend ("Ms. W.") due to what her father perceived as physical abuse by her brother. Three months later, on June 10, 2022, Gloria informed a school counselor that Geoffrey had been touching her inappropriately. In turn, the school referred the matter to the Division. Days later, a Division caseworker interviewed Gloria at the school. Gloria stated her father had inappropriately touched her buttocks, breast, and vaginal area, penetrated her with his fingers, and kissed her on the lips. According to Gloria, she had informed Ms. W. of the abuse, but Ms. W. told her to maintain silence. The caseworker spoke to

505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal.").

A-1278-23

Ms. W. and Gloria's brother, both of whom denied knowledge of sexual abuse.

A social worker at Gloria's school reported that Geoffrey attempted to visit Gloria at Ms. W.'s house on June 18, 2022, but Ms. W. informed him he would not be permitted to see Gloria due to the abuse allegations. The next day, Gloria and Geoffrey spoke on the phone, and Geoffrey allegedly accused her of lying. The school reported the incident to the Division. A few days later, the caseworker, along with a detective from the Essex County Prosecutor's Office, interviewed Geoffrey at his home. Geoffrey denied the sexual assault allegations, and concomitant criminal charges were never initiated.

On June 22, 2022, a forensic interview of Gloria was conducted. Gloria recounted the first time her father assaulted her was when she was nine years old. He told her he loved her, hugged her, and lifted her up in the air, an experience she described as "fun." According to Gloria, as they laid down, the conversation got "weird" and he "touched [her] inappropriately" on her legs and reached for her private area. In describing that incident, Gloria pointed to her vaginal area. When asked whether she recalled what she was wearing, Gloria stated, "[n]o, but I think I was wearing a shirt and . . . a skirt, because how can he reach into my pants?" She then described how Geoffrey would then touch her private area while she had her panties on.

Gloria described another occasion as "the worst day of [her] life." In that instance, she alleged her father touched her breasts, pulled down her pants, touched her vagina, and then instructed her to take off her panties and stand up. He then pulled his pants down and attempted to put his penis in Gloria's buttocks. Gloria backed away, put her panties on, and then went back to her bed. Gloria maintained she felt "sore" afterward. In another instance of assault, Gloria described seeing a white "liquid" emanate from Geoffrey's penis and drop on her clothes, an experience she described as "disgusting." When she walked into the bathroom to wash her pants, she saw Geoffrey in the bathroom "pressing his thing" with liquid coming out into the toilet. Gloria recounted that on several occasions Geoffrey would grab Gloria's hand and force her to touch his penis or slide her hand up and down on his penis.

On June 28, 2022, the Division filed a Dodd removal.[3] The court granted the Division care and custody of Gloria and suspended visitation for Geoffrey. As part of further investigation, Gloria participated in a forensic video interview and underwent a medical evaluation in September 2022 conducted by a pediatrician specializing in child abuse. The pediatrician determined there were

---

[3] A "Dodd removal" refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

A-1278-23

no acute or chronic signs of trauma to Gloria's genitalia or anus. Gloria reported details of the assault, specifically describing the first instance of assault, when Geoffrey told her he loved her, twirled her around, and then touched her "over or under her clothes." She also described an instance when Geoffrey "tried to put his thing in [her] butt, but [she] stopped him and went to [her] bed." Gloria described how, in other instances, Geoffrey would touch and suck her breasts and would make her kiss him on the lips. The pediatrician opined that Gloria should not have further contact with Geoffrey and that she "would likely benefit from therapy with a mental health professional with experience in treating children who have been sexually abused."

Gloria also received a psychosocial evaluation by a psychological clinician, who noted that Gloria "provided consistent reports that [Geoffrey] engaged her in digital-vaginal penetration, anal-penile contact, digital-penile contact, oral-breast contact, and exposure to masturbation and ejaculation." The clinician diagnosed Gloria with "Other Specified Trauma and Stressor Related Disorder." Consistent with that diagnosis, the clinician recommended Gloria would benefit from "individual trauma-focused psychotherapy to help process her sexual abuse experiences." Finally, the clinician recommended Geoffrey should have no further contact with Gloria.

6

A three-day fact-finding trial occurred on March 29, April 3, and April 4, 2023. On March 29, 2023, the court played Gloria's video-recorded forensic interview with the pediatrician. In addition to the recorded interview, the court heard testimony from the pediatrician, the clinician, the caseworker, and Gloria.

The pediatrician testified that the first assault described by Gloria was consistent with "groom[ing]" or "an attempt to make the sexual abuse seem like normal behavior or as part of a loving relationship [followed by] a gradual increase in the severity of the touching." She also testified that it is "very common for children to delay their disclosure of sexual abuse" due to fear and embarrassment. The pediatrician highlighted that "the level of details that [Gloria] gave about some of the incidents" are not within the normal range of sexual knowledge for a "typical 9- or 10-year-old."

The court summarized the pediatrician's testimony:

> She confirmed her previous disclosure of abuse sexual abuse by [Geoffrey]. She said that [Geoffrey] put his finger in her private part and that it was painful. And that he also touched her boobs. [Gloria] told [the pediatrician] that [Geoffrey] had sexually assaulted her multiple times.
>
> . . . .
>
> [Geoffrey] told her to lie down, put her head on his lap. He told her how much he loved her and touched her private part. Other times [Geoffrey] woke her up from

sleep and made her sit on what she described as his "thing" which . . . she then described as the genital area. And sometimes [Geoffrey] was grabbing her and trying to force her and it hurt. At times [Geoffrey] made her sleep in his bed with him.

The clinician testified that Geoffrey had caught Gloria accessing pornography on her cellphone and confiscated it. According to the clinician, that report was significant because it "is often indicative of previous exposure to inappropriate sexual material." The clinician also found it significant that Gloria described "the white liquid coming from [Geoffrey]'s penis" because such "idiosyncratic details regarding that specific incident . . . is not information that a child would typically have and is not nothing (sic) that is easily confabulated." The clinician did not find Gloria's late disclosure to be unusual because "many experiences of sexual abuse are never disclosed and delayed disclosures are also extremely common" due to fear, shame, and difficulty articulating the incident.

The Division caseworker testified consistent with her investigative reports, recounting her conversation with Gloria about Geoffrey coming to Ms. W.'s home on June 18, 2022, and purportedly asking her to recant.

Gloria testified. She recounted how after coming to the United States at five or six, she lived first with her father, then moved to a "babysitter's" house, and then moved to another babysitter's house. She then moved back with her

father until being placed with Ms. W. Her testimony included some inconsistencies. The court questioned Gloria directly as to whether she had fabricated allegations to retaliate against her father for confiscating her cellphone. Gloria responded that, in fact, her father "never gave [her] a cellphone."

The court then questioned whether she understood the meaning of "pornography" or "porno." Gloria answered in the affirmative, explaining that it pertains to "sex" and admitted to watching porn "once in a while" when she was around seven or eight years old "with a little boy." Gloria acknowledged her father became angry because he caught her watching pornography on the boy's cellphone.

On April 5, 2023, the court found that the Division had proved by the preponderance of the evidence that Geoffrey sexually abused Gloria. The court found the expert testimony of the pediatrician to be especially credible "because she was so knowledgeable and patient with explaining the reasons for her conclusions . . . ."

Regarding the clinician's testimony, the court noted that the ultimate question of whether Gloria had been sexually abused was beyond the scope of the evaluation. Nonetheless, the clinician administered a number of

psychological tests, which supported her findings that Gloria's presentation was consistent with a victim of sexual abuse. The court found the clinician's testimony "exceptionally credible." The court commented that the caseworker's testimony was largely historical and observed "there was no real challenge to any of her credibility in testimony."

The court found Gloria's testimony "very credible," acknowledging apparent deficits: "And there were questions, 'What season was it, what time of day was it, what were you wearing.' Most of which were responded to with, 'I don't know. I don't remember.'" The court also acknowledged contradictions between the Division's reports and Gloria's testimony at the fact-finding hearing.

> After the [June 22] interview [Gloria] told the Division about [Geoffrey] coming to the house on June 18th. She said that [Geoffrey] was upset and started yelling at [Ms. W.] She also said that [Geoffrey] threatened [her] and told her she was a liar and asked her to recant her allegations. [Gloria] said that [Ms. W.] then made [Geoffrey] leave the home. She said the next day, June 19th, [Geoffrey] called her on the phone crying and asked her to recant the allegations. She said her brother then got on the phone. And when [Gloria] told [him] what [Geoffrey] did[,] the brother accused her of lying. The child's testimony during . . . her live appearance before me relates a very different story. And that story was that she, herself, had called to the house to speak to her brother. And during [her] discussions with her brother [Geoffrey] started. . . complaining. And her brother[,] who was frustrated with her father being upset about things[,] wanted her to talk her father and

[when] she talk[ed] to her father and he was upset . . . about the things that she had said and that when she got back on with her brother her brother never called her a liar. And her brother never said that she -- that he didn't believe her about the things that had happened.

Notwithstanding these inconsistencies, the trial court found Gloria's overall testimony credible, particularly as it pertained to her description of the assaults. The court noted that during the video-recorded forensic interview,

[s]he spoke with her hands, not only did her words say sort of what was going on, but her hands made the motions of the things that she was saying her father did to her. When she was describing her father at one point trying to put his penis in her buttocks, she made a hand motion that was like a hand wrapped around his penis and moving upwards. She described at times when her father made her grab his penis she put -- she made a hand motion and then she showed his hand moving up and down. . . . She was as expressive with her hands in the descriptions of these events as she was with her words. And sometimes the [c]ourt found it to be even more descriptive . . . than what she said.

The court also noted that Gloria's testimony regarding the sexual abuse was "extremely detailed" and generally consistent with her earlier disclosures. The court then found under N.J.S.A. 9:6-8.21(c) that Geoffrey had abused or neglected Gloria by sexually abusing her and ordered he be placed on the State Child Abuse Registry.

Defendant filed a timely notice of appeal advancing the following

11

arguments:

POINT I

THE STATE'S CASE DOES NOT RISE TO THE LEVEL OF A PREPONDERANCE OF EVIDENCE BECAUSE OF THE SEVERE AND SEVERAL CONTRADICTIONS IN THE STATE'S CASE

POINT II

THE STATE'S CASE CANNOT RISE TO PROOF BY A PREPONDERANCE OF EVIDENCE BECAUSE DCPP'S INVESTIGATION DID NOT PROVE THE ALLEGATIONS.

POINT III

THE STATE'S EXPERT FAILED TO SUPPORT [GLORIA]'s POSITION; MOREOVER, SHE SUPPORTED [GOEFFREY].

Our review of family-court decisions is "strictly limited." N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010). "[W]e apply a deferential standard in reviewing the family court's findings of fact because of its superior position to judge the credibility of witnesses and weigh the evidence," N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021), and "because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). Thus, we are bound to accept the trial court's factual findings as long as

12

they are supported by sufficient credible evidence. N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 155 (App. Div. 2018); see also N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (holding a trial court's findings are entitled to deference "unless it is determined that they went so wide of the mark that the judge was clearly mistaken").

Testimonial Inconsistencies and the Standard of Proof

Defendant's first two arguments are grounded on inferences drawn from inconsistencies in Gloria's testimony. Defendant contends those inconsistencies render Gloria's testimony unreliable, leaving the State's case unsustainable as measured by a preponderance of evidence standard of proof. We disagree.

Judge Furnari elaborated on why he found Gloria's testimony credible notwithstanding inconsistencies and lack of physically corroborative evidence. In this context, we note that corroboration is not a sine qua non of a credibility finding. "[T]he corroboration requirement of the statute does not apply where the child victim testifies to the abuse at a fact-finding hearing." N.J. Div. of Child Prot. and Perm. v. Y.A., 437 N.J. Super. 541, 542 (App. Div. 2014). "To construe the statute otherwise would mean that a child who, as here, is capable of coming to court and testifying, would be defenseless against her abuser unless the Division could produce independent corroboration for the child's testimony,"

13

a result "completely at odds with the purpose of Title Nine to protect children from abuse." Id. at 548. Consistent with Y.A., Judge Furnari observed that defendant's reliance on N.J.S.A. 9:6-8.46(b) was misplaced and recognized that "corroborative evidence is not needed because . . . [the Division] actually presented live testimony." The trial court is uniquely suited to determine the credibility of that testimony because it is in a position to observe first-hand a witness's appearance, demeanor, and manner of testifying, among other judicially-sanctioned lodestars.

Finally, the judge considered Gloria's possible motivation and interest in the outcome of the proceedings. The judge recounted how Gloria testified how much she enjoyed when her father twirled her in the air, caught her, but then touched her vaginal area. After she objected, he stopped. From this Judge Furnari assessed Gloria's credibility:

> Do these explanations of sexual assault sound like the kind of thing that you would want to make up with the purpose to get another in trouble as a revenge for punishment? Do these things sound like the kind of thing that you would want to do to make sure that your father doesn't get your custody back? I'm going to say terrible things about him that included stopping when I say "No"? That include him being nice to me and swirling me around and then doing something like that?
>
> It seems to me that if an 11-year-old in particular is trying to make up something she would make up a story

that was stronger about what her father did and why he did it to her. It seems to me it would be, again, with your motive and your purpose was that that there were a lot of things that you could make up.

It seems to me that these description of what happened by this child are more -- demonstrate that they are more likely true than not true. It seems to me that it is more likely true if she had some motive against her father we wouldn't have these consistent details and rather -- and I don't want to use the word innocent -- but rather sort of affectionate, if it's the right word, or fatherly/daughterly -- a relationship that she was feeling with her father -- than they are of someone who was attacking her so that she could gain an advantage.

[(Emphases added).]

The well-established case law cited in the prelude to our analysis concretizes the deference we owe to the factual findings made by the trial court, particularly those findings pertaining to witness credibility. In assessing the record and findings, we see nothing that causes us to disturb that mandated deference.

Regarding defendant's third point, we are invited to conclude that because the clinician observed Gloria was angry at her father and felt slighted because she was shuffled to different residences and did not have access to a cellphone as her father had purportedly promised, she fabricated allegations of sexual misconduct. The trial court specifically considered and rejected ulterior

motivations. While acknowledging Gloria's symptoms of anger, depression, and anxiety, the trial court attributed those emotions to the evidence and trauma of sexual abuse. To these well-supported findings, we again owe deference.

In sum, our review of the record reflects the family court's determination that the Division proved by a preponderance of evidence Geoffrey's abuse and neglect of Gloria as defined by N.J.S.A. 9:6-8.21(c) is supported by adequate, substantial, and credible evidence.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-1278-23