# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0836-24

IN THE MATTER OF J.L.B.

Submitted October 8, 2025 – Decided January 9, 2026

Before Judges Currier and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Petition No. 1002 XTR 2023 000001.

Sahil K. Kabse, Acting Sussex County Prosecutor, attorney for appellant State of New Jersey (Shaina Brenner, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Caruso Smith Picini, PC, attorneys for respondent J.L.B. (Eric W. Feinberg, on the brief).

PER CURIAM

The State appeals from a November 1, 2024 order denying its application for a Final Extreme Risk Protective Order (FERPO) against respondent J.L.B.[1],

---

[1] Records relating to TERPO and FERPO proceedings are confidential and shall not be disclosed to persons other than respondent except for good cause shown.

a former lieutenant with the Warren County Prosecutor's Office (WCPO). After a careful review of the State's contentions in light of the record and applicable principles of law, we affirm substantially for the reasons expressed by Judge Christopher J. Garrenger in his comprehensive oral decision.

I.

The Extreme Risk Protective Order Act (Act) of 2018 empowers a court to remove firearms from an individual who poses a danger to self or others by possessing them. See N.J.S.A. 2C:58-20. The law was adopted "to permit family members and others to seek emergent orders to remove firearms from a person who poses a danger to self or others because of a mental health crisis or instability." Matter of D.L.B., 468 N.J. Super. 397, 400-401 (App. Div. 2021).

Under the Act, there is a two-stage process for issuing temporary and final orders to remove a person's firearms, ammunition, firearms purchaser identification card (FPIC), handgun purchase permit, and/or handgun carry permit. First, a court must decide, based on the ex parte documentary record, if it will issue a Temporary Extreme Risk Protection Order (TERPO). See N.J.S.A. 2C:58-23. If the TERPO is granted, the court must determine, after a

Guideline 8(a); AOC Directive at 9. We refer to J.L.B. by initials to comply with the Guideline. Admin. Off. of the Cts., Admin. Directive #19-19, Guidelines for Extreme Risk Protective Orders, at 9 (Aug. 12, 2019).

A-0836-24

plenary hearing, if it will issue a final order to remove firearms indefinitely—a FERPO.  See N.J.S.A. 2C:58-24.

In 2022, J.L.B. reported to the Office of Professional Integrity and Accountability (OPIA) information regarding alleged offenses committed by the acting Warren County Prosecutor, James Pfeiffer.  Thomas Dempsey, an investigator with the Division of Criminal Justice of the Attorney General's office, was assigned to investigate the whistleblower allegations.  The Attorney General also assigned Sussex County Prosecutor's Office (SCPO) to assist in the investigation.

From approximately February to September 2023, J.L.B. sent Dempsey a series of text messages expressing his frustration with how the investigation was being handled and the delay of any prosecution.  Although the earlier messages had a professional tone, by September, the messages reflected a change in J.L.B.'s mental and emotional state.

On September 1, 2023, J.L.B. texted:

> I spent the last five years months of my mother's life with this investigation "ongoing."
>
> During the remaining months I had with her before she died, I had to have my focus and my attention divided by this investigation.  I spent the rest of her life dealing with the stress and the anxiety of this matter.  That's how I spent the rest of her life.  This is unacceptable!!

3

I don't know what the reason is for this protracted investigation, but enough is enough.

In a September 14, 2023 text message J.L.B. stated: "[w]hat if I told you I was going to hurt myself Dempsey? Would that have your attention? I wonder if you'd give a f[**]k then. Or maybe since you guys aren't doing anything, I will go handle Pfeiffer myself."

In a second message sent that same day J.L.B. stated:

You guys should be ashamed of yourselves. . . . Seriously, how do you sleep? Scumbags.

. . . .

You guys will have to kill me to make me shut up. I know you hope I'll go away. But I won't. I'm going to keep after this, because I'm right and you're wrong. And you know it. I gave you proof!!!!! But you were a chicken s[**]t who only [has] stock answers. Just going with the flow of corruption.

On September 21, 2023, J.L.B. texted Dempsey saying:

Have you ever been a whistleblower who's been kept in the dark 18+ months, while the criminals you reported and work for continue to subjugate you and relegate you to complete irrelevancy in an agency you spent two decades in??? . . . have you ever been turned into a pariah within your own agency after doing the right thing? Do you spend your time now essentially isolated because your colleagues are afraid to be seen talking to you because they have an idea that you are the whistleblower?

4

The manner in which your agency handle[d] this case, and my status, as a whistleblower [] has been devastating to my well-being. And I don't mince words when I say devastating. You have stolen my mental well-being, and there is absolutely no excuse for that.

And then you have the nerve to tell me that you were "finalizing your report" for the 10th time . . . .

That same day, SCPO Detective-Sergeant Kyle Phlegar filed an application for a TERPO in Hunterdon County. Based on the verbal threats and J.L.B.'s statements regarding his own declining mental health, Phlegar believed that J.L.B. posed an immediate and present danger of causing bodily injury to himself or others by owning, possessing, purchasing, or receiving firearms and/or ammunition, and required a TERPO. The municipal court granted the TERPO later that evening.

Also on September 21, Lieutenant Nicholas Elmo of the SCPO and two other detectives became aware of the text messages between J.L.B. and Dempsey and decided to visit J.L.B. to complete a mental health check. Elmo was not involved in filing the TERPO.

After arriving at J.L.B.'s residence, Elmo rang the doorbell and J.L.B. responded through his "Ring" doorbell. J.L.B. advised that he was at Princeton House, an outpatient mental health facility, receiving treatment. When Elmo visited J.L.B. at the facility, J.L.B. told Elmo that he was not a harm to himself

5

and that his text message regarding Pfeiffer was not a threat to harm Pfeiffer, but rather a threat to arrest him. Two therapists from the mental health facility told Elmo they did not think J.L.B. was a harm to himself or anybody else.

SCPO Detective Olivo was also present at J.L.B.'s home with Elmo. He spoke with J.L.B.'s wife, Julie[2], who gave him verbal consent to search the home during which the detective found two Daisy Ryder BB guns[3] and J.L.B.'s FPIC.

In December 2023, while the FERPO hearing was still pending, New Jersey State Police went to J.L.B.'s residence for a well-being check after Julie called 9-1-1 to report that J.L.B. had threatened suicide. When the troopers arrived at J.L.B.'s home, they found J.L.B. and Julie talking in the garage. The police learned that J.L.B. and his wife had a verbal argument regarding an extramarital affair J.L.B. was having. The police left shortly thereafter.

Later that evening, Julie called police advising J.L.B. had taken three unspecified anxiety pills and Julie had removed the pills from J.L.B.'s mouth. Police arrived again and then left after determining J.L.B. was alright and did not need to go to a crisis center.

---

[2] We use a pseudonym to protect the parties' privacy.

[3] Julie testified the BB guns belonged to their children, aged twelve and fifteen.

A-0836-24

On December 12, 2023, Julie called 9-1-1, stating J.L.B. had threatened suicide. She said J.L.B. told her that "he wanted to die" and said goodbye to her and their daughter "in a weird way." Julie later found J.L.B.'s phone, wallet, and a note saying he was sorry at their residence. She told the dispatcher J.L.B. was taking several medications for bipolar disorder and depression.

The State Police responded to J.L.B.'s father-in-law's residence where they found J.L.B. in an upstairs bedroom lying in bed with vomit on his clothing. J.L.B. informed the troopers that he was "not armed at all" and that he had taken about ten muscle relaxant pills.

Although the statute requires a FERPO hearing to take place within ten days of the issuance of a TERPO, see N.J.S.A. 2C:58-24, a number of issues arose regarding counsels' availability, including sickness and then the death of J.L.B.'s attorney, that caused a delay of many months.[4] When the hearing took place in September and October 2023, the court heard testimony from Phlegar, Elmo, Olivo, and Julie.

Phlegar explained he applied for the TERPO because "[J.L.B.] appeared to be in—I don't want to say some sort of crisis but he was exhibiting concerning

---

[4] The matter was also adjourned for scheduling conflicts of witnesses, experts and the court.

A-0836-24

behavior in his text messages just to get the attention of the investigator [Dempsey]." Phlegar said he believed that J.L.B.'s message to Dempsey on September 14, 2023, saying "[w]hat if I told you I was going to hurt myself, Dempsey? Would that have your attention" was "suicidal in nature."

Olivo described the two incidents when J.L.B. took pills. He stated that in the eleven months that had passed since those events, he was unaware of J.L.B. attempting either to hurt himself or threaten to hurt others. Olivo also agreed the text messages reflected J.L.B.'s frustration with Dempsey's lack of response to him and the slow pace of the investigation. He further stated J.L.B. did not make any threats to Pfeiffer's life.

During her testimony, Julie stated J.L.B. was prescribed several medications in the Fall of 2023 including Depakote which she said "really affected him in a negative way." She described him as depressed, angry, moody and impulsive. She also discussed the two times J.L.B. took pills in December 2023. Julie testified J.L.B. no longer takes Depakote and continues treatment with a mental health specialist. She described him as "a new man," explaining "[w]hen on the Depakote he was not himself. I have known him forever. For almost 30 years. He's back to his baseline now that he's not on that medication. He's . . . just, wonderfully, a great father. A wonderful husband. He's a hard

worker. . . . [H]is mood is completely stabilized and he's just [the] man I married."

Julie advised J.L.B. had voluntarily entered and completed two inpatient treatment programs in December 2023 and January 2024 and there were no weapons in their home.

In a well-reasoned oral decision issued November 1, 2024, Judge Garrenger analyzed the factors articulated under N.J.S.A. 2C:58-23(f), and Administrative Office of the Court's (AOC) Guideline 3. After making credibility determinations, the judge concluded the State did not establish by a preponderance of the evidence that J.L.B. posed a significant danger of bodily injury to self or others by owning, possessing, purchasing or receiving a firearm and, therefore, he denied the State's application for the issuance of a FERPO.

II.

On appeal, the State contends the trial court erred in denying its application for a FERPO because it presented evidence at the hearing that J.L.B. threatened to harm himself in a text message sent to Dempsey as well as the December 2023 suicide attempts. The State also asserts J.L.B. threatened to harm Pfeiffer.

A-0836-24

We acknowledge "[t]he scope of appellate review of a trial court's fact-finding function is limited." Matter of D.L.B., 468 N.J. Super. at 416 (alteration in original) (quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)). We are generally bound by trial court findings "when supported by adequate, substantial, credible evidence." Ibid. (quoting Cesare, 154 N.J. at 411-12). When evidence is testimonial and involves credibility questions, deference is "especially appropriate" because the trial judge is the one who has observed the witnesses first-hand. Ibid. (quoting Cesare, 154 N.J. at 412). An appellate court will not disturb a trial court's findings unless they "went so wide of the mark that the judge was clearly mistaken." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

The issuance of a FERPO is governed by N.J.S.A. 2C:58-23(f). The statute requires a court to consider eight factors—whether the individual: (1) has any history of threats or acts of violence directed toward themselves or others; (2) has any history of use, attempted use, or threatened use of physical force against another person; (3) is the subject of a temporary or final restraining order or has violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991," [N.J.S.A 2C:25-17 to -35] . . . ; (4) is the subject of a temporary or final protective order or has violated a

temporary or final protective order issued pursuant to the "Victim's Assistance and Survivor Protection Act,"[N.J.S.A. 2C:14-13 to -21] . . .; (5) has any prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense pursuant to [N.J.S.A. 2C:12-10], or domestic violence offense enumerated in [N.J.S.A. 2C:25-19(3)]; (6) has any prior arrests, pending charges, or convictions for any offense involving cruelty to animals or any history of acts involving cruelty to animals; (7) has any history of drug or alcohol abuse and recovery from this abuse; or (8) has recently acquired a firearm, ammunition, or other deadly weapon. See Matter of D.L.B., 468 N.J. Super. at 403.

Administrative Directive #19-19, requires a court to consider three additional factors, based on the Act's statement that the eight factors comprise a non-exclusive list, N.J.S.A. 2C:58-23(f), and the requirement that courts consider "any other relevant evidence" in deciding to issue a FERPO, N.J.S.A. 2C:58-24. See Admin. Directive #19-19, at 6. Those three factors pertain to whether the respondent: (9) has recklessly used, displayed, or brandished a firearm; (10) has an existing or previous extreme risk protective order issued against him or her; and (11) has previously violated an extreme risk protective order issued against him or her. See id. at 4-5.

If a court finds at least one of the eleven "behavioral" factors, then it "may consider" four additional factors pertaining to a person's mental health—whether the respondent: (12) has any prior involuntary commitment in a hospital or treatment facility for persons with psychiatric disabilities; (13) has received or is receiving mental health treatment; (14) has complied or has failed to comply with any mental health treatment; and (15) has received a diagnosis of a mental health disorder. See id. at 5; Matter of D.L.B., 468 N.J. Super. at 404.

In denying the State's application for a FERPO, Judge Garrenger carefully analyzed the evidence presented to the court and the testimony of the witnesses. The judge found Sergeant Phlegar "generally credible" and noted the officer knew nothing about the lengthy investigation that was the subject of the text message communications between J.L.B. and Dempsey. However, the judge gave Julie's testimony the heaviest weight as she was the most familiar with J.L.B. and his character.

The judge also considered each statutory factor. As to the first factor, "whether there has been a history of threats or acts of violence directed towards self or others," Judge Garrenger noted that

> here we have an initial assertion to [Dempsey] that
> could be considered either a mode or method to get the

attention of [Dempsey] insofar as the whistle blower matter had been going on and there was no reasonable response in a reasonable time frame by Investigator Dempsey or it could be viewed as a potential assertion of harm to himself. The court cannot find that necessarily the assertion was a threat to harm in the context of the ongoing investigation and the lack of communication by the Attorney General's Office in response to inquiries by . . . [J.L.B.] . . . [t]here are reasonable alternative explanations.

In addition, Judge Garrenger found that as to the assertion of the threat to Pfeiffer, there were also reasonable alternative explanations. Id. He stated that

[o]ne, there was an assertion of potential harm to Prosecutor Pfeiffer. The other, which was consistent with the testimony elicited by Lieutenant Elmo dating back to his time when he met with . . . [J.L.B.] at Princeton House. The assertion then and continued to be here in court that . . . was simply meant to say that . . . [J.L.B.] could go and arrest the Prosecutor for the alleged criminality.

Thus, as to the first factor, Judge Garrenger concluded that "the court cannot find that there has been a history of threats or acts of violence towards self or others. Again, alternative explanations for the assertions and the court weighs heavily the consistent testimony of Lieutenant Elmo, as well as the arguments of counsel with regard to those assertions."

13

Judge Garrenger next found there was no evidence of "a history of use, attempted use or threatened use of physical force against another person" as required under the second factor. He stated that

> related to assertions regarding Prosecutor Pfeiffer, the court believes and the credible assertions through Lieutenant Elmo and counsel . . . those assertions were simply related to the ability of . . . [J.L.B.], as a law enforcement officer and a lieutenant in the Prosecutor's [o]ffice, to arrest an individual who he believed and there was probable cause to have committed a crime or offense.

As to factors three through six, the judge found the State did not present any evidence or testimony to support any findings regarding those factors.

In addressing factor seven, Judge Garrenger considered whether J.L.B. "has any history of drug or alcohol abuse and any recovery from this abuse." The judge found the note that J.L.B. left for his wife that said "I'm sorry" could be interpreted multiple ways, such as "at its most basic level as an indication of being sorry for infidelity that was clearly outlined[,] or it could have been some type of indication of suicidal ideation." Judge Garrenger stated he found "this factor because, again, there was an attempt to take three antianxiety pills, which were characterized as more than the prescribed dosage. . . . But there was also the ingestion of the [ten] muscle relax[ants] that resulted in the response from the State Police and EMS." However, the judge ultimately found that

14

A-0836-24

[t]hose incidents are remote in time, spanning back almost 11 months in the passage of time and the fact that there have been no other issues that have arisen and there are no allegations by any individual, including the spouse of [J.L.B.], who was the one who called 9-1-1 twice with her concerns. She has indicated clearly that due to the treatment that he has undergone—underwent and finished in January of 2024, the subsequent modification of the regimen of medication that he has been prescribed and taking, the court notes that there has been recovery from this abuse.

Judge Garrenger noted that factor eight—whether the individual "has recently acquired a firearm, ammunition, or other deadly weapon" is not applicable as "the two Red Ryder BB guns . . . were for [J.L.B.'s] children."

Judge Garrenger found that factors nine, ten, and eleven were not applicable. Factor twelve was also not applicable because J.L.B.'s only treatment was in two in-patient treatment facilities, both voluntary admissions.

As to factor thirteen, "whether the respondent has received or is receiving mental health treatment," Judge Garrenger noted that J.L.B.

had received mental health treatment. The court heard credibly from [Julie] that [the] regimen of medications prescribed to him caused a wholesale change in his personality and that those medications have been modified in the context of him having received and is receiving mental health treatment. The court heard credible testimony from [Julie] that since he was released from the voluntary inpatient treatment and the medication regimen modified that there have been no

15

A-0836-24

issues, although he is continuing to receive mental health treatment. It is on a less frequent basis.

In considering factor fourteen, Judge Garrenger noted that "there is no credible testimony before the court to indicate that . . . [J.L.B.] has done anything other than comply with any mental health treatment." And, in addressing factor fifteen, "whether the respondent has received a diagnosis of a mental health disorder," Judge Garrenger noted that "the court heard oblique references to [J.L.B. suffering from depression]. . . ."

Judge Garrenger concluded that:

> [T]he court in the largest view sees an individual, . . . [J.L.B.], who was in the middle of and a genesis of an investigation from the [WCPO] that impacted his job, his reputation in his office; that [J.L.B.] was not getting any reasonable responses from the investigators in the OPIA and sent text messages which are certainly open to interpretation but consistent with the testimony of witnesses, do not rise to the level of direct threats to self or others. Expressions of frustration for the lack of communication.

The judge also found that

> many of those issues that were the source and the genesis of the frustration of [J.L.B.] have been addressed an[d] ameliorated by the resignation of the Prosecutor and the—evidently, the matter having been investigated thoroughly by the [OPAI] and so those issues no longer exist and it does also appear from the testimony of [Julie] that the issues regarding the potential dissolution of the marriage have also been

A-0836-24

addressed since December 2023. Today being November 1, 2024.

In addition, the judge advised the passage of time weighed heavily in his determination.

Thus, Judge Garrenger concluded that the State had not established by a preponderance of the evidence that J.L.B. posed a significant danger of bodily injury to self or others by owning, possessing, purchasing or receiving a firearm and he denied the State's application for the issuance of a FERPO.

After careful review, we are satisfied Judge Garrenger did not err in denying the State's application for a FERPO. The judge properly weighed the evidence presented by the parties and concluded that the State did not establish the requisite standard to obtain a FERPO against J.L.B. The decision was supported by the evidence in the record and rested on the proper application of the governing principles of law.

As stated, Judge Garrenger found Julie to be an "immensely credible" witness and determined there were no other issues, reported by her or any other individual, since December 2023 and that the prior incidents referenced by the State were remote in time, spanning back eleven months. Julie also testified regarding J.L.B.'s successful completion of treatment, and ongoing therapy as well as the modification of the prescribed medications. All of these findings,

A-0836-24

properly analyzed by Judge Garrenger in accordance with N.J.S.A. 2C:58-23(f), support the decision to deny the State's FERPO application against J.L.B.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0836-24